## ESTATE OF HENRY KESLER, DECEASED.

APPEAL BY C. M. LUKENS ET AL. FROM THE ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued March 27, 1891—Decided October 5, 1891.
[To be reported.]

(a) An intended wife, of mature years, of sound mind, and free from restraint, executed an ante-nuptial contract, whereby, in consideration of the provision made for her therein, on a full disclosure at the time of all the facts as to the estate and with a full knowledge of the contents of the instrument, she released all her future interest in her intended husband's estate:

1. The marriage having taken place, the settlement was to be considered as having embodied in it the real intentions of the parties at the time of its execution, and therefore, as conclusive of their rights. Fraud, on the part of the husband, sufficient to avoid the settlement, would not be established by proof, by one witness, of his declarations to the effect that he intended a deception of the wife.

2. The wife becoming estranged by reason of her dissatisfaction with the settlement, and threatening legal proceedings to annul it, a promise by the husband, afterwards violated, to preserve unrevoked a codicil to his will giving her the one third of all his estate, was without sufficient consideration to operate as a revocation of the settlement, on the abandonment of such proceedings.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, MCCOLLUM and MITCHELL, JJ.

No. 177 January Term 1891, Sup. Ct.; court below, number and term not shown.

On November 12, 1889, the account of Charles M. Lukens and Thomas M. Montgomery, executors of the will of Henry Kesler, deceased, was called for audit.

At the hearing, it was shown that the testator died on June 23, 1888, leaving a will dated May 18, 1883, duly admitted to probate. The account, as corrected, showed a balance for distribution of $134,376.96, one third of which was claimed by Mrs. Mary R. Kesler, as the widow of the testator electing to take against the will. In a codicil to his will, dated October 6, 1884, the testator referred to the fact that after the date of the will he had married, and before his marriage had entered into a marriage settlement with his wife whereby he had secured to her the sum of six hundred dollars per annum, in the event of her surviving him, to be paid to her during her life, which settlement he confirmed; and as a further provision for his said wife, he bequeathed to her the sum of two thousand dollars, to be paid to her out of the first moneys to come into the hands of his executors. By a second codicil, dated August 18, 1885, to increase the share of his estate that he had set apart for his wife's benefit by the marriage settlement and the former codicil, the testator bequeathed to her the sum of fifteen thousand dollars, which by said marriage settlement he had conveyed to trustees, and directed said trustees to assign and convey said trust fund to her absolutely, free and clear of all the trusts of said settlement; and he bequeathed to her, further, such part and portion of his estate as, with the said sum of fifteen thousand dollars and the two thousand dollars bequeathed to her by the former codicil, would amount to the one full equal third part of his whole estate, to hold the same to her absolutely.

. Statement of Facts.

By a third codicil, dated October 28, 1887, the testator revoked both the former codicils as improvidently made, and in lieu thereof gave and bequeathed to his wife, in addition to the annuity provided for in the marriage settlement, the further yearly sum of six hundred dollars, which he directed to be paid to her by his executors yearly during her life or widowhood; "and if my said wife marry again at any time after my decease, then the said yearly payment of six hundred dollars shall cease and determine, and revert to and become part of my residuary estate."

It was admitted that the claimant was the widow of the testator, and that she was married to him on May 20, 1883. At that time the testator was about seventy-three years of age, the wife, formerly Mrs. Mary Rebecca Davidson, a widow with two children, being somewhat over thirty.

The accountants, also the trustees, under the will, of Thomas H. Kesler and George Kesler, sons of the testator and the devisees of nearly the whole of the estate, proved and put in evidence a formal deed of marriage settlement executed by Henry Kesler, of the first part, Mary Rebecca Davidson, of the second part, and Charles M. Lukens and Thomas M. Montgomery of the third part, and bearing date May 6, 1884. This deed was long and formal, but in substance recited the intended marriage of Mr. Kesler and Mrs. Davidson, and assigned and conveyed to said Lukens & Montgomery a certain mortgage security for fifteen thousand dollars owned and held by Mr. Kesler, in trust to receive the interest thereon as it was payable, to pay such income to Mr. Kesler during the joint lives of said Mr. Kesler and Mrs. Davidson, and upon the decease of Mr. Kesler, if said Mrs. Davidson should survive him, to pay over to said Mrs. Davidson, for and during all the term of her natural life, the sum of six hundred dollars, in even and equal half-yearly payments from the day of the decease of said Mr. Kesler; in consideration whereof, the said Mrs. Davidson, on her part, covenanted " to accept the provision herein made and provided for her, as a full discharge and satisfaction of all rights of dower, or thirds, or other right, title and interest, which by virtue of such marriage she may or might acquire or become entitled to in the estate of him the said Henry Kesler." The trust created by this deed was accepted by Charles M. Lukens

and Thomas M. Montgomery of date as written May 6, 1884. The date of the acknowledgment as given on the deed was May 6, 1884, but the deed was recorded and the assignment noted on the margin of the mortgage on May 19, 1884. Lukens & Montgomery appeared to be the business agents and advisers of Mr. Kesler.

There was also put in evidence by the accountants and trustees a "Statement of the Investments and Estate of Henry Kesler," showing a list of securities and their value, which, with the dwelling-house and grounds of said Kesler valued at $9,000, made the then total value of his estate $118,300. To this list was attached a writing signed by Mrs. Davidson, bearing date May 6, 1884, setting forth that she had examined the said list of securities, etc., and acknowledged that she had been made acquainted with the value and amount of Mr. Kesler's estate. Messrs. Lukens & Montgomery and the subscribing witnesses, also Mrs. Clara E. Kesler, a daughter-in-law of the testator, all testified that the purpose and contents of both said papers were fully made known to Mrs. Davidson before she executed and acknowledged them.

The claimant called Dr. Howard Patterson, who testified that he was the family physician of Mrs. Davidson; that from February 22, 1884, Mrs. Davidson was seriously sick, part of the time delirious, and was convalescing only, on and about May 20th; that Mr. Kesler called upon him several times before the date last mentioned, and on the last visit, two or three days before the marriage, he spoke to him about whether she could go out to attend to the signing of "that paper;" that "he was particularly anxious to have her go and sign that paper, telling me that he expected to marry her, and it was absolutely necessary to sign that paper before the wedding. . . . He told me that his intention was to settle some money on Mrs. Kesler prior to her wedding, so that there would be no dispute afterwards, in the event of his death, so far as the will was concerned. My recollection is that he told me that it was to be independent of anything else, and was a provision to prevent any after trouble." The witness assented that his patient should go out for an hour or so, and testified that up to the time of the execution of the deed Mrs. Davidson was in a weak nervous condition.

Statement of Facts.

Under objection on the part of the trustees to any testimony as to declarations of Mr. Kesler or anything that occurred after the signing of the paper, Lawson C. Funk testified that he was the husband of a daughter of Mr. Kesler who died in 1882; that Mr. Kesler and he were on very intimate and friendly terms, and that at various times Mr. Kesler talked with him about the subject now in controversy, both before and after his marriage; that the witness advised against the marriage; "he told me he was having a paper prepared by scriveners Lukens & Montgomery, to protect himself and his heirs, as she was a young widow, and he did not know what she might do; to use his language, she might jump the traces." The testimony of this witness, as to the declarations of Mr. Kesler before the execution of the deed, went to show that Mr. Kesler intended to have Mrs. Davidson execute the deed under the belief that the provision made for her in it was to be independent of and in addition to her interest in his estate under the intestate laws; "that this would not interfere with her rights." The witness testified, further, that he never saw Mrs. Davidson until the next Sunday after she was married to Mr. Kesler; that in 1886, there was a family difficulty and Mrs. Kesler left home and would not return unless Mr. Kesler's son and the wife of the latter should leave; that this difficulty was adjusted by the witness and the claimant returned; that in May, 1887, Mr. Kesler came to the witness very much excited; he said, "The cat is out of the bag, and the devil is to pay; the thing is all up now, but you are the man to help me out of this difficulty; we can shut her eye up again; she has found out all about this, all about this marriage agreement; she has proceeded with legal proceedings; I have got a letter from her lawyer on Market street, and took it in to Lukens & Montgomery, this morning, and got their advice;" that the witness, though objecting at first, finally consented and went with Mr. Kesler to see the claimant; that the claimant said she had been advised by her counsel not to make any compromise whatever, unless the marriage settlement was destroyed; that any codicil he might add to his will would not amount to a straw. The witness then proceeded:

"A. Yes; I am getting to that. He says, 'You certainly have that much confidence in me, that you will take my word

### Statement of Facts.

if I promise that I will give you one third of my personal and real estate and revoke all marriage agreements and codicils that I have made; you certainly will have that much confidence in your husband.' She says, ' You played a trick on me, and if you will in one instance you will in another.' He says, ' Well, you don't think that I will do that, when I give you my word. You never asked me any questions in regard to the other. You do not suppose I would do a thing like that ; and don't you see this man standing by to witness that I will make all wrongs right?' . . . . . He says to her, ' You will find that I have given you one third absolutely, and I will make a promise, and here is your witness, I will not destroy it or change a letter in any manner, shape or form whatsoever, without you and he have knowledge of it, at any time in the future ; that I will revoke all agreements, set aside, but not destroy from the record.' He says, ' I wont promise to do that, because my word is sufficient, without destroying that which is recorded on the record.' She says, ' If you will show Lawson the marriage agreement, and he will witness all that you will say that is in the will, why, I will tell you when you return. Make an investigation, and I will make up my mind between this time and the time you return, and I will tell you what I will do. But I am loth to accept any compromise whatever under the conditions, the way I have been treated.' She asked him why he made that provision in that marriage settlement, in the first place, and he related what I have gone over,—to protect his family; that she might jump over the traces ; that he fully intended, if she proved to be a faithful, good wife,—he only had this to protect himself and his family,—if she proved to be what he thought she was, and what she had now turned out to be, he would have given her at the same time one third. We left.". . . .

The witness then testified that the next morning he and Mr. Kesler called upon Lukens & Montgomery and examined the marriage settlement, the will, and the codicils then attached to it; that the same day they called together upon Mrs. Kesler, and the witness stated to her what he had seen of the papers ; that she asked witness if he would advise her to accept this, and the witness declined to give her advice ; that Mr. Kesler then said, " You will certainly advise her, when you have heard

Adjudication.

the statement made and have seen that it was made personally, and then substantiated by a document which carries out everything that I have said." The witness then proceeded:

"I said I certainly could not under the conditions. He said to her, 'I have promised to give you one third. I have promised to set aside the marriage agreement. I have brought you now an attorney, (as he called me,) to represent you, in case of any trouble to protect you, and have shown him that every statement that I made was absolutely correct, and he does not bring home any objection whatever. Now, what else under the heavens do you want a man to do? I have done all I can do.' She says, 'As my attorney, do you advise me to accept it?' I said, 'I have no advice to give whatever.' She hesitated, and they had repeated remarks, and then she says, 'Papa, I have concluded to accept this, since you have shown it to Lawson, and have pledged yourself that you would not change, alter, or destroy it; that you will not in any manner, shape or form, alter the codicil, the last codicil to that will, without his or my knowledge; that you willingly, without any persuasion, called in him to represent me, and as you have had confidence in him to represent you in another case, I will have confidence enough in him to represent me, so I will accept it.' They shook hands, kissed, made up, and I went home."

On November 21, 1889, the auditing judge, ASHMAN, J., filed an adjudication in part as follows:

The widow elected to take against the will. Her eligibility to elect was of course barred, so long as the marriage settlement stood; and, in support of the settlement, it was shown that the claimant, at the age of about thirty, a widow and possessed of little if any property, was engaged to be married to the testator who was seventy-three. Two days before the ceremony, she went with the testator's daughter, at the testators' request, to the office of these accountants, who were the legal advisers of the testator, and she there executed the settlement. The paper was in formal shape, and set apart fifteen thousand dollars, in the hands of the accountants, in trust to secure the payment of an annuity to the claimant of six hundred dollars, commencing at the decedent's death. It was accompanied by a schedule of the decedent's property which desig-

Adjudication.

nated the several investments and included a piece of real estate valued at nine thousand dollars, and it showed a total of $118,300. Before executing the settlement, both papers were read over to the claimant, and she admitted that she was satisfied with them.

This was the case for the estate; and as all the testimony which was afterwards received was strenuously objected to, it may be well to determine whether at this point, the ante-nuptial arrangement was in legal contemplation complete. The auditing judge regards the question as doubtful.

The attitude of the contracting parties required, on both sides, the amplest disclosure of every fact which could assist the judgment. Perhaps the duty of an ordinary counsel, who had been engaged by the husband, would have been discharged when he had read over to the wife the items which constituted the estate of the husband and the provisions which made up the settlement, because he might have assumed that neither party was ignorant of the law. But it will scarcely be said that any lawyer, engaged by the wife, would have stopped at the reading of these papers, and ended his responsibility when he was satisfied they were in due form. These accountants, however, stood as close to the widow as if they had been her attorneys, for they were her trustees. They knew that she was bartering an absolute interest of thirty-six thousand dollars in cash, and a life-interest in real estate, for an income of fifty dollars per month; and, certainly, if they chose to refrain from advising her as to her legal rights, or even from asking her if she had made a single calculation, they might at least have assured themselves that she had received advice elsewhere. They were bound to this by the persuasive fact that they were the paid advisers of the husband; that they had advised him as to the provisions of the settlement, and had actually drafted its provisions; and that, just so far as the interest of the husband could be said to be opposed to the interest of the wife, they, as the representatives of the husband, were, in a very understandable sense, antagonists of the claimant.

The importance of these suggestions as to the duty of counsel is instantly apparent when the conduct of the husband is considered. He had persistently assured the claimant that the provision by way of settlement was a gift entirely independent

of her share in his estate, and was intended to meet her immediate necessities in case of his death or of a difficulty with his family. With this preconceived misunderstanding of its meaning, she listened to the reading of an instrument which is as remarkable as the will for the extent of its verbiage, and gathered from it, if she gathered anything at all, that she was to receive six hundred dollars per annum, exactly the amount of the gift which her husband had told her she would receive. A single word from her own trustees would have dispelled the delusion, or rather have unearthed the treachery; and the trustees remained silent. Their defence was, that, as advisers of their own client, they were not called upon to represent also the interest of the party with whom he dealt. This is ordinarily true; but it is not true where the other party is in a relation of the closest dependency upon that client, and certainly not, where she is the beneficiary of a trust which they have accepted as her trustees.

Passing this point, the auditing judge, upon the evidence which was given by the claimant, and without going into more detail than can be avoided, finds these facts: The claimant had suffered for some months from nervous prostration, culminating at one time in delirium, and was only fairly convalescing when she was married. Two days before that event, the decedent called upon her physician, as he had done previously, and expressed the greatest anxiety that the claimant should sign a paper, the object of which he said was to settle money upon her to avoid a dispute in case of his death. On that day, the doctor gave his consent, which he, had heretofore refused, to the execution of the business, provided it could be dispatched in an hour, his hesitancy having arisen from his knowledge of the claimant's nervous condition. The paper was accordingly executed under these circumstances.

The intended marriage was the subject of frequent conversations between the decedent and his son-in-law, who was decidedly opposed to the new connection. To this gentleman the decedent declared that he was about to prepare a paper which would protect himself and his heirs, and which he would not show to his wife until two or three days before his marriage; that she was poor and was grateful to him for presents, one in particular of one hundred dollars; that she would ask no ques-

Adjudication.

tions, and that he would "pull the wool over her eyes." He added that he had told her the paper would not interfere with her rights, and would be independent of them; that he had been advised in the matter by his scriveners, and that they would take care of him. At this time, the son-in-law did not know the claimant nor where she lived; and he never in fact saw her until after the marriage.

Two or three years thereafter, the claimant came to the witness for aid in settling a family dispute which had induced the claimant to leave the house. He then declared that his wife had found out about the settlement; to use his own words, " the cat is out of the bag, and the devil is to pay." He avowed his willingness to make any promises that would soothe her, and added that he could creep out of his new promise as he had crept out of old ones. The son-in-law positively refused to move in the matter; but afterwards, he met the decedent and claimant at their own house; and the claimant, then stating that her husband had promised to retain a codicil to his will by which she would be given one third of his estate, and that nothing therein would be changed without the son's consent, requested the witness to examine the will for himself. Accordingly, the witness repaired with the decedent to·the office of these accountants, and was shown the codicil revoking the marriage settlement and granting the thirds. He objected that the codicil could be annulled and the settlement thereby reinstated. The reply of the decedent, in the presence and hearing of the accountants, was that he would not revoke it, and that the instrument should be at all times open to the witness's inspection. When the witness afterward reported to the claimant that he had read the codicil in question, and found it to be as represented, the decedent renewed his assurance to his wife in the most solemn and unqualified terms, that he would never revoke what he had there promised; and asked whether in return she would forego the legal proceedings which she had threatened. She so promised. Two years afterwards he executed the codicil of revocation.

This evidence, if competent and uncontradicted, established such fraud in the procuring of the contract as rendered the contract void. It certainly was uncontradicted, and the auditing judge believes was competent. The general principle, of

course, is conceded, that parol declarations of either party, donor or beneficiary, to an instrument, will not be permitted to contradict what he has written in the deed: Frey v. Heydt, 116 Pa. 601. But this will have its exception, where those declarations are a part of the res gestæ: Dinkle v. Marshall, 3 Binn. 587. See also the late case of Brooks v. First Presb. Church, 128 Pa. 408. That in this instance they entered into the heart of the transaction itself, there can be no manner of uncertainty. They were made to the claimant just before she signed the paper; they were false in fact, and were intended to deceive her, and their statements were the inducement to her action.

Here the doubt may be interposed that a chancellor will not set aside an instrument upon the oath of a single witness, and with no corroborative circumstances. But that point does not arise (although confirmatory evidence followed in the subsequent events), because the burden of proof was, in the first instance, upon the accountants. It was their duty to show by affirmative evidence that no advantage was taken of the confidential relation in which the claimant and decedent stood, and that the claimant executed the contract with a full knowledge, not only of its provisions, but of their effect: Shea's App., 121 Pa. 302. How far they failed to do this, has been already shown. But the auditing judge is entirely willing that all this reasoning shall be dismissed as inconclusive. He will then rest his decision upon another proposition.

The evidence established a new promise, with a valid consideration behind it; and nothing can avail to prevent a recovery by the claimant on that promise. The undertaking was to give her one third of the estate, and the consideration was her refraining from suit. It makes little or no difference that the testator chose to put that promise in the shape of an instrument which bore a revocable character; this suit is upon the promise which was complete before the codicil was written, and of which the codicil is only collateral proof. The accountant's case is not aided by the circumstance that the vehicle of the promise was selected on account of its easy adaptability to fraud. The oath of one witness was sufficient to make out the undertaking, but in reality there were three witnesses. The decedent's pledge to retain the codicil unchanged was given to the wit-

ness who repeated it, and in the presence and hearing of the accountants; and it was not denied by counsel. The argument of the latter was, not that such a pledge had not been made, but simply that it was not binding.

The auditing judge, does not, however, propose to discuss at greater length the questions which he has barely touched, because they will undoubtedly be carefully considered by the court in banc. He admits the claim of the widow to share in the estate as though the testator had died intestate, and as though no marriage settlement existed.

Exceptions to the adjudication and the distribution directed thereunder, filed by Charles M. Lukens and Thomas M. Montgomery, trustees, and Thomas H. Kesler and George Kesler, cestuis que trust, having been argued before the court in banc, the court, HANNA, P. J., on January 18, 1890, filed the following opinion :

In Tiernan v. Binns, 92 Pa. 253, the present Chief Justice said : " I see no reason why the law should regard with disfavor an ante-nuptial contract, especially where, as here, it was entered into by parties each of whom was advanced in years, with separate children and separate estates. Persons so situated do not usually act from mere impulse, or contract without consideration. Such family arrangements, in many instances, reconcile differences and avoid unpleasant disputes. Where they are free from fraud, there is no reason why they should not be enforced." What is here said is strikingly applicable in the present instance ; and the deed of marriage settlement between testator and the claimant, then his intended wife, should not be set aside except upon evidence of fraud or concealment, deception or misrepresentation, the equivalent of actual fraud.

We have carefully considered the entire testimony ; and, apart from the evidence of imposition and deceit, practiced by testator to obtain the execution of the marriage settlement by his intended wife, and of his subsequent contract with her not to alter or revoke the codicil to his will, which expressly set aside the deed of settlement and gave her the full one third part of his estate, no reason is shown to justify the interference of a court of equity to prevent the execution of the contract.

Opinion of Court below.

The testator was seventy-three years old, with children by a former marriage; and the claimant was a widow between thirty and forty years old, a mother, and possessed of more than ordinary intelligence and education. She was informed by testator of the preparation of the deed of marriage settlement, and two days prior to the marriage, at his request, accompanied the wife of one of his sons to the office of his conveyancers, where a written statement of his entire estate, real and personal, prepared by the conveyancers, was submitted and read to her, after which the deed of settlement was also read to her in the presence of testator and his daughter-in-law; and, in reply to the inquiry of the scrivener whether she had any questions to ask concerning the deed, claimant replied she had not, and that she understood and was fully satisfied with it. She then, together with testator, executed the deed, in the presence of disinterested witnesses, and acknowledged it before a notary, who carefully observed the time-honored formula. Thus, every requirement of the law seems to be complied with. A full disclosure was made to the intended wife, and every opportunity afforded her, either to obtain information as to the nature and character of the instrument she came prepared to execute, or object to its execution, if ignorant of its contents or deceived as to its purpose and object. She was not illiterate: Shea's App., 121 Pa. 302; but intelligent and well educated. She was not young and inexperienced, but of mature years and acquainted with marital duties and rights. She was a free agent, of sound mind, and fully capable of protecting herself. Nor was she under duress or constraint. The deed of settlement, although of great length, is in the usual form adopted by careful and accomplished conveyancers; and its preamble, in clear and perspicuous language, easily comprehended by a person of even ordinary intelligence, specified the terms and objects of the agreement entered into between the parties. That it was fully understood by the claimant, we think there can be no doubt. And from her necessitous circumstances it is not wholly improbable she was content, assured of the maintenance and comforts afforded by her future husband's wealth during his lifetime, and the secured annuity of six hundred dollars for her life after his death, to relinquish all further claim upon his estate.

Opinion of Court below.

Apart from the testimony, not yet referred to, we think the testator, as husband, did all he was obliged to do, in order to give his intended wife such knowledge of his estate as would enable her to act intelligently. There is no concealment, but, on the contrary, ample disclosure. The conveyancers who prepared the deed, and therein selected by the parties as their trustees, acted with fairness, candor and good faith. As already stated, one of their number prepared the schedule of property and deed, and read both to the intended wife, and, with perfect honesty and integrity as a wholly impartial and disinterested business man, inquired if she understood and was satisfied with it. We cannot conceive he was bound to do more. He then saw the claimant for the first time, but knew her errand to his office. And there is no evidence that either he, or his copartner, had the slightest intimation or knowledge of any deceit or misrepresentation by testator, to accomplish the execution of the deed by his intended wife. Under the facts shown, the law presumes the claimant fully understood the contents of the deed, and willingly executed it; and the conveyancer, who read to her the deed, might well from her acts and declarations reach the same conclusion.

But it was strongly urged at the argument that the trustees were derelict, and failed fully to perform their duty; that it was incumbent upon them to advise and instruct the claimant as to her rights under the law, ascertain whether she had made a calculation of the value of her interest in her intended husband's estate, or had obtained advice, perhaps, in relation to her rights as wife and widow, and the propriety of the execution by her of the deed of settlement. But we do not understand this formed any part of their duties. They were trustees both for testator during his life, and for his intended wife only in the event of her surviving him. Their duties as trustees for them did not commence till then. And furthermore, the trust was only as to the fifteen thousand dollars set apart to pay her annuity. We therefore think the relation between the claimant and the trustees in the deed is misconceived.

But irrespective of this question, the auditing judge has found as a fact that the deed was executed by claimant through misrepresentation and fraud, practiced upon her by her in-

tended husband, and under the belief and confidence in his assurances that the provision thereby made was wholly independent of her share in his estate, and to provide for her in case of his death or difficulty with his family. This testimony is not shown to be unworthy of belief, nor are the conclusions of fact shown to be unsupported by evidence. If, then, the claimant was duped and deceived by her intended husband, and by his falsehood and deception led to enter into the marriage contract, whereby, to adopt the language of the auditing judge, " she was bartering an absolute interest of thirty-six thousand dollars in cash and a life interest in real estate for an income of fifty dollars per month," it should be set aside.

By reason of the confidential relation between the parties, the utmost good faith is required. Confidence is reposed by each in the other, and if that confidence is abused, courts of equity will grant relief: Story's Eq., § 308; Bispham's Eq., § 230. And among the many cases upon the subject may be cited: Kline v. Kline, 57 Pa. 123; Darlington's App., 86 Pa. 512; Smith's App., 115 Pa. 319; Shea's Appeal, supra; and Neely's App., 124 Pa. 406. But a still more cogent reason appears for a total disregard of the marriage settlement and allowance of the claim of the widow; and that is, the failure of testator to comply with his undertaking and agreement with her not to annul the codicil to his will whereby he had revoked the deed of marriage settlement, upon the faith of which promise and undertaking she withdrew from the legal proceedings she was about to institute to set aside the deed.

That testator entered into such a contract with his wife, is fully proved and uncontradicted. On August 18, 1885, he. executed a codicil revoking the marriage settlement, and bequeathed his wife one full third part of his estate. In 1886, or early in 1887, having discovered the imposition practiced by her husband, whereby she was induced to execute the deed of marriage settlement, she consulted counsel with a view to institute legal proceedings to annul the deed. In consequence of notice from counsel of his wife's intention, testator sought the intervention of a son-in-law, who seems to have been the confidant of all his domestic troubles, and invoked his aid to secure a reconciliation. His mediation resulted in the assurance and promise by testator to his wife that, if she would be-

come reconciled and withdraw the threatened litigation, he would not destroy or alter in any manner the codicil of 1885, without first informing her and his son-in-law.   Upon the faith of this promise and undertaking, testator's wife withdrew from her contemplated legal proceedings, and, confiding in the promise made by her husband, continued upon amicable relations with him until his death on June 23, 1888.   The subsequent action of testator, however, proved that little reliance could be placed upon his promise, and verified the statement by his wife to him during the negotiations for a settlement before referred to, that " You played a trick on me, and if you will in one instance you will in another."   For, upon his death, it was discovered that on October 28, 1887, he had executed a further codicil, whereby he revoked the prior codicils of October, 1884, and August, 1885, thus reinstating the provisions of the deed of marriage settlement, and giving her an additional annuity of six hundred dollars per annum during life, which he magnanimously provided should cease upon her re-marriage.

It will surely not be contended that this wilful disregard of his promise and flagrant violation of his contract will be countenanced by a court of equity.   The promise was made upon a consideration always recognized as valuable, and therefore binding, and this was the agreement of his wife to withdraw her threatened legal contest and the resumption of marital relations with him.   Upon a similar principle, a promise to compensate for services rendered, by leaving a legacy, is held to be founded upon a good consideration, and may be enforced: Thompson v. Stevens, 71 Pa. 161 ; Hartman's App., 3 Gr. 271 ; Cottrell's App., 4 W. N. 237 ; Pollock v. Ray, 85 Pa. 428.

The consideration, moreover, was a compromise of a family disagreement and difficulty, which is favored in equity if made in good faith and with a full disclosure: Bispham's Eq., 192 ; Walworth v. Abel, 52 Pa. 370 ; Wilen's App., 105 Pa. 121 ; and Burkholder's App., 105 Pa. 31, which is precisely in point with the case now before us, and where the entire subject is fully considered by the present Chief Justice.   There the contract was post-nuptial, but the object was to settle the differences between husband and wife which caused the latter to abandon her husband.   They afterwards became reconciled, and executed a deed under seal, whereby, in consideration of

Arguments.

the compromise of the differences theretofore existing between them, they should enjoy their separate estates therein set forth; and it was held there was sufficient consideration to support a provision in favor of the wife's issue by her former marriage, contingent upon the husband surviving the wife and dying, which upon his death will be enforced in a settlement of his estate. And it would appear from O'Keson v. Barclay, 2 P. & W. 531, where it is held that the compromise of an action of slander, in which the words laid in the declaration are not actionable, is a good consideration for a note for the payment of the money; that the wife gave a good consideration for the promise and undertaking by her husband, even though she might be unsuccessful in her suit to annul the deed.

We accordingly conclude that, by reason of the failure of testator to comply with the terms of his contract, if no other valid reason be shown, the claimant should not be barred from asserting her claim to take against the will, notwithstanding the deed of ante-nuptial settlement; and she is entitled to one third of the personal estate absolutely, as if her husband died intestate.

—A decree of distribution in accordance with the foregoing opinion having been entered, the exceptants took this appeal, specifying that the court erred:

1. In awarding to Mary R. Kesler one third part of the personal estate.

3. In ruling that the statement to the wife by the husband that he had given her one third by will, followed by her refraining from leaving his house and stopping proceedings to avoid the deed of marriage settlement, constituted a contract that the wife can now enforce against her husband's estate.

*Mr. R. P. White* (with him *Mr. J. M. Pile*), for the appellants:

1. It is conceded that the deed of marriage settlement was executed in strict conformity to law. It was fully read to Mrs. Kesler. She was asked if she understood it; she answered in the affirmative. She was asked if she desired any explanation of it; she answered in the negative. She was shown a schedule of the description and value of the estate of her intended husband, and not only understood it but signed a decla-

ration to that effect. She was a woman of intelligence and education; and there is no evidence that she was in any respect misled. The general rule is, that a party executing a legal instrument is presumed to be acquainted with its contents; and where it is unconnected with suspicious circumstances, the burden of disproving the presumption lies on him who would impeach the deed: Greenfield's Est., 14 Pa. 489. And if one who is about to execute an instrument can read it, and neglects to do so, or, being blind or illiterate, chooses to act without requiring the contents to be made known to him, he will be bound by it: Penna. R. Co. v. Shay, 82 Pa. 203.

2. Giving full effect to Funk's testimony as to what Kesler told him he intended to do, to protect himself and his property from his wife, the evidence of the other witnesses as to what took place before and when the deed was executed, shows conclusively that what the husband told Funk he intended to do was not done. And again; the testimony of Funk as to the agreement by which Kesler was not to revoke the codicil to his will which invalidated the deed of trust, stands alone without any corroboration. Upon the uncorroborated word of an evidently prejudiced witness, we are to restore the dower right released by the deed of marriage settlement. Evidence to destroy a written contract must be clear, precise and indubitable; the instrument is the strong evidence to be overcome, and this can only be done by the testimony of two witnesses, or of one witness corroborated by circumstances equivalent to another: Thomas v. Loose, 114 Pa. 35. And the declarations of Kesler, after the fact, are of no force to overcome the deed: Herster v. Herster, 122 Pa. 239.

*Mr. John G. Johnson* (with him *Mr. Samuel P. Hanson*), for the appellee:

1. There is no rule of evidence which requires that fraud shall be proved by more than one witness, but the physician proved a statement by Kesler which was strongly corroborative of what was shown by the testimony of Funk. And the evidence produced concerning what took place at the time of the execution of the instrument, was perfectly consistent with the existence of the fraud that induced Mrs. Kesler to do what she did. Impressed by the man in whose honesty she confided,

Arguments.

she paid but slight attention to the long and formal instrument. Of course, it is presumed, as against a person of sound mind who signs an instrument, that he or she is acquainted with its contents; and it is within the line of sound policy that the courts shall hold to the presumption until it be overcome by proof to the contrary. The presumption, however, necessarily falls, after uncontradicted proof of the existence of a deliberate fraud calculated to induce the execution.

2. The relation which the man bears towards the woman to whom he is engaged, is one of trust and confidence. The engagement gives to the woman certain rights. If a contract be executed by her which injuriously affects her rights, and nothing appears in the case but the fact of the marriage settlement, and of execution after reading or having heard read the contents, it will be sustained unless the settlement be grossly inadequate. Saving under very extraordinary circumstances, fraud will not be presumed. If, however, there be affirmative proof of fraud, the settlement will be annulled. The woman does not bear such a position towards the man as will permit him to induce her signature to the settlement by any deceit whatever: Shea's App., 121 Pa. 317; Neely's App., 124 Pa. 424; Kline v. Kline, 57 Pa. 120; Tiernan v. Binns, 92 Pa. 248; Darlington's App., 86 Pa. 512; Miskey's App., 107 Pa. 611; Yardley v. Cuthbertson, 108 Pa. 395; Boyd v. Boyd, 66 Pa. 293; Russell's App., 75 Pa. 279.

3. The burden is upon the person taking the gift to show that the transaction was fair and proper: Boyd v. Montague, 73 N. Y. 502. In the present case, in which a woman, who relied upon a man to whom she was engaged, executed in a perfunctory manner an instrument prepared by his counsel, which he had taken pains should not be seen by any counsel representing her, there is as little to induce the court to sustain her execution, in the light of the facts establishing fraud, as there was in Russell's App., 75 Pa. 269. The burden of proof being on the beneficiary under the deed, he should clearly and affirmatively have proved that the woman (*a*) fully knew what she was doing; (*b*) was entirely competent to act; (*c*) was wholly free from undue influence; (*d*) had independent advice; and (*e*) that the transaction was righteous; (*f*) that it fully expressed her intentions; (*g*) that " the deed

was the fully understood act of her mind;" and (*h*) that she had full knowledge "of its import and effect:" Story's Eq., § 308; Kline v. Kline, 57 Pa. 123; Shea's App., 121 Pa. 321; Whelan v. Whelan, 3 Cow. 537; Gross v. Leber, 47 Pa. 525; Thomson v. White, 1 Dall. 426. And the declarations of an interested party made before, at the time of, or after a contract, are evidence against him: Duncan v. Lawrence, 24 Pa. 154; Shirley v. Shirley, 59 Pa. 267; Munger v. Silsbee, 64 Pa. 454; Simons v. Oil & M. Co., 61 Pa. 202; Fuller v. Kelsey, 4 Brewst. 106.

4. There was a valid contract, upon sufficient consideration, to treat the marriage settlement as void, and to maintain un-revoked a codicil to the will giving the wife one third of the testator's personal estate. The settlement of a family difficulty and dispute was held a sufficient consideration for a promise, such as this, in Burkholder's App., 105 Pa. 36. The settlement of family disputes has repeatedly been held to be a sufficient consideration to support a contract: Wilen's App., 105 Pa. 124. And it appears by Smith v. Tuit, 127 Pa. 341, that it is immaterial that the decedent puts his contract into the shape of a codicil. As was there said, "the devise loses its revocability, and must be treated as an executory contract." The ruling by this court upon the subject is in accordance with Dufour v. Pereira, 1 Dick. 419, and Wigram on Wills, 4. An instrument may operate as a will in one part, and as a deed in another: Wigram on Wills, 27; Babb v. Harrison, 9 Rich. Eq. 111 (70 Am. Dec. 203); Brinker v. Brinker, 7 Pa. 55; Johnson v. McCue, 34 Pa. 180.

OPINION, MR. JUSTICE STERRETT:

There is certainly no apparent reason why, situated as these parties were, the "law should regard with disfavor" the ante-nuptial agreement made by them. Mr. Kesler was advanced in years, had already accumulated a fortune, and had a family by a former marriage; while Mrs. Davidson was lifted out of poverty and comfortably provided for by it. Persons, situated as they were, do not usually act from mere impulse, or con-tract without consideration; and the court below has accord-ingly found that "Every requirement of the law seems to have been complied with in the execution of this contract. A full

disclosure was made to the intended wife, and every opportunity afforded her, either to obtain information as to the nature and character of the instrument she came prepared to execute, or object to its execution, if ignorant of its contents or deceived as to its purpose and object. She was not illiterate, but intelligent, and well educated. She was not young and inexperienced, but of mature years, and acquainted with marital duties and rights. She was a free agent, of sound mind, and fully capable of protecting herself. Nor was she under any restraint. The deed of settlement, although of great length, is in the usual form adopted by careful and accomplished conveyancers, and its preamble, in clear and perspicuous language, easily comprehended by a person of even ordinary intelligence, specified the terms and objects of the agreement entered into between the parties. That it was understood by the claimant, we think there is no doubt. And from her necessitous circumstances it is not wholly improbable she was content, assured of the maintenance and comforts afforded by her future husband's wealth during his lifetime, and the secured annuity of six hundred dollars for her life after his death, to relinquish all further claim upon his estate."

It is impossible to understand how, consistently with these facts, Mr. Kesler can be found to have practised a fraud upon his intended wife in the execution of this contract. In his senile garrulity he may have made statements to his son-in-law which had better have been left unsaid; but, when brought face to face with his wife, he distinctly averred, and she did not deny, that she had never asked him any questions in regard to the agreement, and that he had made the settlement "to protect his family; that she might jump over the traces; that he fully intended if she proved a faithful, good wife,—he only had this to protect himself and his family,—if she proved to be what he thought she was, and what she had now turned out to be, he would have given her at the same time one third." But, whatever may have been his original intention, in view of the findings of the court below that Mrs. Davidson, knowing her rights and fully informed of the situation, deliberately and in writing released all her interest in her deceased husband's estate in consideration of the provision made for her by this agreement, and was content,

Opinion of the Court.

it is incredible that a fraud should have, in fact, been practised on her. Even assuming that the facts are as claimed by her counsel, the quantum of proof adduced is not sufficient to modify the agreement; they were not proved by two witnesses or their equivalent: Thomas v. Loose, 114 Pa. 35.

The agreement must be considered as having embodied the real intention of the parties at its date, and therefore conclusive of their rights. Was there a valid revocation of it? It will be conceded that there must have been a meritorious or valuable consideration for such revocation: Stickney v. Borman, 2 Pa. 67; and it is very clear that neither of these existed here. The sole inducement was the doing of that which Mrs. Kesler was legally bound to do. She had voluntarily estranged herself from her husband, because of her dissatisfaction with the ante-nuptial contract; there is no pretence that she had any other cause of complaint. If, as has been shown, that was a valid and binding contract, the estrangement was without justification; it was a wanton abuse of the marital relation for mercenary purposes, and reconcilement was her duty. Public policy forbids that the performance of such duty may be made the subject of barter and sale. The law fixes and regulates the marital relation on public considerations, and will not allow the parties to discard and renew it for money. Thus, in Robert v. Frisby, 38 Tex. 219, the Supreme Court held that the husband is not legally bound by a post-nuptial contract in which he hires his wife to live with him. The same principle was affirmed by the Supreme Court of Tennessee, in Copeland v. Boaz, 9 Baxt. 223. And Mr. Justice ALLEN, of the Supreme Judicial Court of Massachusetts, well said: "It is as much against public policy to restore interrupted conjugal relations, as it is to continue them without interruption for the same consideration. The right of condonation is not exercised for the sake of justice to the injured party, or with regard to the rights of others or the interests of the public, when it is sold for money, and the law cannot recognize such a consideration:" Merrill v. Peaslee, 149 Mass. 460. There are no cases, in conflict with this view, decided by this court. It was not involved in Burkholder's App., 105 Pa. 31, upon which the court below relied.

It is said that abandonment of the legal proceedings insti-

Statement of Facts.

tuted by Mrs. Kesler for the revocation of the ante-nuptial contract was sufficient consideration. The answer to this is that she was not prejudiced by that act; the question involved there has been raised here, and has been shown to be without merit. Mrs. Kesler is therefore not in a position to claim the aid of a court of equity, and the decree of the court below must be reversed.

> Decree reversed with costs to be paid by the appellee, and record remitted with instructions to distribute the fund in accordance with the foregoing opinion.

On November 11, 1891, a motion for a re-argument, filed by Mr. Samuel P. Hanson and Mr. G. Morgan Eldridge on behalf of the appellee, was refused.