## McCready's Estate.

Argued October 9, 1934.   Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey, Drew and Linn, JJ.

248

*R. T. M. McCready,* with him *Harry S. Dunmire,* for appellant.

*William A. Wilson,* with him *Edward B. Scull,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, November 26, 1934:
On November 19, 1924, Dr. R. J. McCready, appellant herein, and Matilda S. Heck were married. He was then a widower 74 years of age and possessed of an estate which he now says was then worth between $30,000 and $50,000. She was a widow 63 years of age and was possessed of a much larger estate. Some time previously, Edward B. Scull, Esq., then and now a deservedly prominent member of the bar, on instructions from Mrs. Heck, had drawn an antenuptial agreement to be executed by herself and her intended husband, and the day before their marriage they called at Mr. Scull's office to execute it. Mr. Scull handed it to appellant, who read it through slowly, and with meticulous care. After he had thus read it, Mr. Scull asked him if it was all right, and appellant said "Yes." Then Mr. Scull said to both of them: "Now do you have each the understanding of the other's property, that enables you to say that this is a fair contract between you?" They both said they had such an understanding of it. A question then came up regarding the recording of the antenuptial agreement. When considering that question Mr. Scull says he said to them: " 'This is important because of the fact that

Mrs. McCready [as she afterwards became] is a large real estate owner; she has a very large amount of real estate, and she is interested in 18 or 20 pieces of real estate, along with her brothers and sisters, being a one-sixth interest in the Joseph W. Craig Estate'......and when I was enumerating those properties the Doctor [appellant] interrupted me by saying in effect 'Probably I know more about her property than you do'; and so [Mr. Scull] said I also thought that was probable and I discontinued mentioning anything about it." A notary public was then sent for and the antenuptial agreement was executed in triplicate in the presence of and was witnessed by Mr. Scull, his secretary and the notary public, and was acknowledged by appellant and testatrix before the notary. Neither of the parties wished the agreement to be recorded, because, as they said, it was a matter with which the public was not concerned; so Mr. Scull drew an additional agreement, covering the properties in which Mrs. McCready had an undivided interest, and the next day, after the wedding, the two of them called at Mr. Scull's office and executed and acknowledged it.

The antenuptial agreement provides, inter alia, as follows: "Whereas, it is the intention of each of the parties hereto that each shall have full power and control of his or her estate and of the disposition of it by will or otherwise notwithstanding said marriage.

"Now This Agreement Witnesseth: That the parties hereto have agreed and do hereby agree, the one with the other, for and in consideration of said marriage, as well as of the benefits to be derived by each, as follows, to wit:

"First: R. J. McCready, M.D., for himself, his heirs, executors and administrators, agrees that in case the said intended marriage shall take effect, that he will waive and release and he hereby, for himself, his heirs, executors and administrators, does waive and release unto the party of the second part [testatrix], her heirs, executors and administrators, all claims or demands of

every character or description which he may, might, could or shall acquire by reason of the consummation of said intended marriage, in any property, real, personal or mixed, of which said Matilda S. Heck is now or may hereafter during the said intended coverture become seized or possessed in her own right, whether by way of curtesy or by virtue of any statute or statutes for the distribution of intestates' estates, and he covenants to and with the said Matilda S. Heck, her executors and administrators, that he will not elect to take against any will of said Matilda S. Heck now existing or which she may hereafter publish and declare disposing of her estate—Provided, always, nevertheless, that nothing herein shall be construed as releasing the claim or right of said R. J. McCready, M.D., to any testamentary provisions now or hereafter to be made for him by said Matilda S. Heck.

"Second: [This paragraph contains covenants by testatrix in similar language to that quoted above. The agreement then proceeds:]

"Third: That each of the parties hereto has been given full opportunity to acquire and has such full knowledge of the property and estate of the other as to allow each to enter into this agreement with full knowledge that its provisions may be to the financial disadvantage of him or her and each waives in favor of and to the other and his or her heirs, executors and administrators, the right to have this agreement nullified in whole or in part for or by reason of lack of knowledge, at the time of the signing, of the full measure and value of the estate of the other.

"The true intent and purpose of this agreement being on the part of each to release to the other, his or her heirs, executors or administrators, any claim or demand he or she might have or acquire by reason of marriage in the estate of the other, whether by way of curtesy, dower, exemption or under any intestate law, and to allow each

to control and dispose of his or her property to the same extent as if said marriage had not taken place."

On June 21, 1933, testatrix died and left appellant a legacy of $1,000 a month "so long as he shall live, the first payment to be made on the first day of the first calendar month succeeding my decease." Nevertheless, and despite his covenant and agreement above quoted, he executed, acknowledged and recorded an election "to accept the legal alternative of taking under and according to the intestate laws of the State of Pennsylvania instead of under [her] will." The parties in interest under the will thereupon instituted the present proceeding, praying that his said election "be annulled and declared of no effect to the same intent and effect as though it had never been executed and recorded, and that a certified copy of the decree be registered with the Register of Deeds for the City of Pittsburgh and of said Allegheny County and with any other proper authority empowered to keep a register of real estate in and for said County and City, and be recorded with the Recorder of Deeds of Allegheny County, Pennsylvania, and that the Register of Wills and Clerk of this Court enter on the margin of the record of the will of said decedent, and on the record at No. 170, July Term, 1933, of this Court, a notation showing the number and term of this proceeding and that the election filed is annulled." To this an answer was filed, followed by petitioners' replication, a trial in due course, and an adjudication in favor of granting the prayer of the petition. Respondent filed exceptions thereto, which, after argument, were dismissed, and a decree entered as reported by the trial judge. The present appeal was then taken.

At no time, not even during this contest, did appellant state that he did not understand the antenuptial agreement. He insisted at the trial that it was not executed until after the marriage, but the evidence against that claim was so overwhelming that, in his brief in this court, it has been abandoned. He also claimed that

he thought it was only a temporary expedient to cover the period of a wedding trip he and testatrix were about to take. Its language is such, however, that no one of even ordinary intelligence could have so thought. At the time he executed the agreement, he says in his answer, he had been practicing his profession for upwards of half a century, and was "in full flush of mental and physical vigor." It is clear, therefore, that when, "slowly and with meticulous care," he read the language of the agreement, which stated that "he has such full knowledge of the property and estate of [his intended wife] as to allow [him] to enter into this agreement with full knowledge that its provisions may be to [his] financial disadvantage," he knew full well what he was then representing to her and the others present, and hence the court below properly found that "judging by his degree of intelligence he understood its meaning,"— a conclusion also necessitated by his statement then made to Mr. Scull's secretary: "I don't want any of Daisie's [his intended wife's] money." If, then, knowing the meaning of the words in the agreement, he none the less signed and delivered it, and, on the faith of his so doing, testatrix married him, he cannot now be heard to contend, after she is dead, that she married him in the belief that he did not waive the right to claim, in case she predeceased him, in antagonism to her testamentary provisions. This conclusion is alone sufficient to require a dismissal of the present appeal, but we prefer, in respect to the elaborate brief of appellant's counsel, to proceed a little further.

So far as this record discloses, the subject-matter of the antenuptial agreement came up but once thereafter. Some eight years after it was executed, appellant sold one of his properties, and desired testatrix to join with him in a deed to the purchaser. This she was not willing to do without ascertaining from Mr. Scull whether or not her doing so would affect the antenuptial agreement. Testatrix, appellant and the purchaser

thereupon called on Mr. Scull in regard to the matter. She said to him "I have refused to sign that deed for fear it might interfere with our agreement with regard to managing our property, and I told the doctor [appellant] 'I would not sign it unless I had your advice in regard to it.' " Mr. Scull advised her to sign it "because, ......instead of being against her interest, it was simply carrying out the agreement." She thereupon signed it and appellant and the purchaser settled for the sale. Appellant does not directly dispute this incident, though he claims that he never heard of the antenuptial agreement, from the time it was executed, until after testatrix's death.

Appellant seems to think that if he can, by constant repetition, induce the court to believe that he did not know the exact value of testatrix's estate at the time he executed the antenuptial agreement, that fact alone will require the striking down of the agreement. The law is not so. In some respects, every contest in this class of agreements is unique. In each, all of the relevant facts must be grouped together, and, when considered in bulk, the court must determine whether or not the party objecting has a just right to complain.

"Antenuptial contracts are not inherently fraudulent, nor is there any such presumption. They require good faith, but fraud is not presumed in them any more than in other cases. There must be some evidence of gross disproportion or other fact from which fraud may be inferred before the onus changes": Robinson's Estate, 222 Pa. 113, 115.

"I see no reason why the law should regard with disfavor an antenuptial contract, especially where, as here, it was entered into by parties each of whom were advanced in years with separate children and separate estates......Such family arrangements, in many instances, reconcile differences and avoid unpleasant disputes. Where they are free from fraud there is no reason

why they should not be enforced": Tiernan v. Binns, 92 Pa. 248; Krug's Est., 196 Pa. 484, 487.

"When we consider the question of the adequacy of the provision we must regard all the circumstances surrounding the case. This was a marriage between persons well advanced in years. The appellant was not the mother of his children, nor was she likely ever to bear him any. She had not in any way aided him to accumulate his fortune. She had $12,000 of her own, all of which he relinquished. In addition he gave her $600 per year during her life. What claim had this old woman, marrying this old man, to come in and take one third of his estate away from his children, and yet retain the whole of her own? She would of course have had a legal claim had he married her without an antenuptial contract; but she had no claim which made it inequitable or unjust in him to insist upon the execution of the contract before the marriage. It would have been a wrong to his own blood if he had not made some such arrangement. It was not a liberal provision, but it was adequate. She retains all of her own estate, and has now in addition $600 per year, besides a comfortably furnished home. Surely her last condition is better than her first.

"There is a marked distinction between this case and that of a young couple just entering upon the voyage of life. In the latter instance, they grow up together; the wife is the mother of his children; she shares his burdens in his early struggles, and often by her thrift and economy materially aids him in the accumulation of his fortune. To cut off such a wife with a mere support during life would be as unjust as it would be ungenerous. But when a man in the decline of life, who has been twice a widower, and who has two sets of children, for the third time leads a woman to the altar, and an elderly woman at that, it is very different. In such case the wife reaps where she has not sown, and, if she is provided with a comfortable support after her hus-

band's death, she has no just cause of complaint. In any event, if she is dissatisfied she ought to refuse to sign the contract, and not accept its benefits during her husband's life, and then seek to repudiate it after his death": Neely's Appeal, 124 Pa. 406, 426-7.

If "the agreement was in fact fairly and openly made, and though the husband's exact means were not stated appellant knew 'he was in comfortable circumstances' [it suffices]. She had no estate of her own, and from a pecuniary point of view the marriage was altogether favorable to her. Under the circumstances no presumption of fraud or concealment ever arose": Birkbeck's Estate, 215 Pa. 323, 326.

"The true test of the adequacy of the consideration in an antenuptial agreement, is whether the provision for the intended wife is sufficient to enable her to live comfortably after his death, in substantially the same way as, considering all the circumstances, she had previously lived": Clark's Estate, 303 Pa. 538. In the present instance the court below found, upon ample evidence, that testatrix's legacy to him of $1,000 a month will probably enable him to live better than he did before the marriage. In this conclusion we concur.

If there was no evidence of what took place at the execution of the agreement which the appellant seeks to have set aside, it is presumed there was no designed concealment or imposition: Whitmer's Estate, 224 Pa. 413. Here, there is undisputed evidence of what took place, and it excludes all possibility of designed concealment or imposition on the part of testatrix. Appellant's signature to the agreement, which stated that he knew its contents, is affirmative proof that he was not deceived when he signed it: Smith's Appeal, 115 Pa. 319, 321.

If one who signs a paper can read and write, and is under no duress when he or she signs it, "the law presumes that, under such circumstances, [it is signed] with full knowledge of its contents": Birkbeck's Estate, 215 Pa. 323, 325.

The principles set forth in the authorities above quoted, each and all tell against appellant's contention. It is clear from the evidence that appellant knew exactly what he was doing when he signed the antenuptial agreement; that he knew his intended wife was a woman of large means, though he may not have known of exactly what her estate consisted; that he expected to live at her home after they were married and wholly at her expense; he admits that during the nine and a half years of their married life "she paid everything," and this included not only their living expenses with all the accessories which her means permitted, but included also the expenses of the numerous and extended trips they took in this country and abroad; and that, in addition thereto, she gave him large sums of money for his own use.

It is clear to us, as it was to the court below, that appellant "offered no evidence to indicate that there was any actual fraud committed in the procurement of the agreement"; "that any person with very limited experience and powers of observation must conclude ......that Mrs. Heck was a woman of large resources," and that appellant must have known that fact; that the testimony does not disclose "any attempt by any one, either directly or indirectly, to misrepresent or conceal anything from [appellant] in the procurement of the agreement." It seems clear that appellant was content with what he was to get and did get, and that it was only after he learned that he could not be deprived of the $1,000 a month given by the will, even if his election to take against it was stricken down, that he conceived the idea of attempting to get a large share of the corpus of the estate. Of course, the idea and the attempt were alike abortive.

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellant.