## Disco Estate

Before Pawelec, *Administrative Judge,* Bruno, Silverstein, Jamison and Shoyer, specially presiding, *JJ.*

*John E. Power, Jr.* and *William J. Kelly,* for exceptant.
*Nicholas J. Nastasi,* contra.

JAMISON, *J.*, July 11, 1977—In this action, the learned auditing judge found that a valid antenuptial agreement barred the surviving spouse's election to take against her deceased husband's will and her claim for the family exemption. He also granted the prayer of the executor's complaint in equity, determining that she should vacate decedent's home and turn over the contents and household effects. The widow filed exceptions which were argued before the court en banc. We now dismiss the exceptions.

The Supreme Court, in Hillegass Estate, 431 Pa. 144, 244 A. 2d 672 (1968), sought to eliminate the confusion and conflict resulting from different expressions of the applicable standards and principles to be applied in considering the validity of antenuptial agreements, and enunciated five controlling principles. Although these guidelines purport to be definitive, it is apparent from a review of the decisions both before and after Hillegass that each case is unique and that the resolution of each rests on an equitable evaluation of the facts. Accordingly, a review of the circumstances of and the relationship between the parties in some detail is appropriate.

Domenic Disco was a 59-year-old widower, and Julia Sisto was a divorcee, age 41, at the time of their marriage and the execution of the antenuptial agreement. Their friendship and courtship had extended over a period of seven years. Mr. Disco was the founder of the Armstrong Springs & Auto Parts Co., a highly successful business in which his two adult sons by his first marriage were also employed.

When they met, Julia Sisto, a 34-year-old married woman with children, was working as a teller at the Fidelity Bank branch at 10th and Snyder Avenue in

Philadelphia, about a half block away from decedent's business located at 907-913 Snyder Avenue. She worked at that branch at various intervals, including the year immediately before the marriage. As part of her duties, she accepted deposits and handled withdrawals for five or six savings and checking accounts owned by decedent personally and at least two accounts for his business. She thus knew the amounts of the deposits and the resulting bank balances. She was a frequent visitor to decedent's home at 2912 South Broad Street. She had visited the business many times and, although there was conflicting evidence as to whether she had handled the ledger books prior to the marriage, she had, by her own admission, on occasion performed the bookkeeping for the Armstrong Springs & Auto Parts Co., which had an average gross annual revenue of approximately $240,000.

Shortly after she started to date Mr. Disco, Julia Sisto was divorced from her first husband. She characterized the divorce as a "very complicated affair," and explained that her family home was sold at sheriff's sale, purchased by her father, and later conveyed to her individually approximately three years prior to her marriage to decedent.

On August 22, 1973, exactly three months before the execution of the antenuptial agreement, and four months before the marriage of the parties, Mr. Disco wrote a relatively simple five paragraph will in which he left all his property, proportionately, to his two sons. He expressed his desire that the Armstrong Springs & Auto Parts Co. should continue as an on-going business for his sons, and made appropriate provision therefor. The will bears the blue backer of Carmen C. Nasuti, Esq., who is a

cousin of Julia Sisto Disco. The witnesses to the will are Carmen C. Nasuti and Ann Marie Nasuti, his wife.

On November 29, 1973, Julia Sisto and decedent, Domenic Disco, signed an antenuptial agreement in the office of Ralph M. Evans, Esq. The language of the instrument is straightforward and uncomplicated. The clauses in the agreement might be characterized as boilerplate and appear virtually verbatim in the standard form to be found in Dunlap-Hanna Pennsylvania Forms §4311.3, at 256-256.4. The agreement varies somewhat from the standard form in that, attached thereto as schedule "A," is a list of the realty and personalty of the decedent, and as schedule "B," a list of the realty and personalty of Julia Sisto. Neither schedule gives the dollar figure for the individual assets listed or the total value.

The agreement acknowledged that each party had children by a former marriage and that it was their desire that the marriage should not change the rights of the children to the estates of their respective parents. By its terms, the parties relinquished all rights in the estate of the other, including the right to the family exemption. No provision was made for either Mr. Disco or Julia Sisto in the body of the agreement. The agreement clearly states that it is "entered into by each of the parties . . . with the full knowledge on the part of each other as to the extent *and probable value* of the estate of the other," and further recites that, ". . . *full disclosure* has been made to the wife." (Emphasis supplied.) The schedules set forth the realty, personalty, bank accounts, and safe deposit boxes by address, account numbers, and locations.

The parties were married exactly one month after the execution of the agreement. The record does not disclose whether it was coincident with the agreement or the marriage that Mr. Disco (doubtless at substantial expense to a man aged 59) purchased a life insurance policy with The Prudential Insurance Company of America in the amount of $60,000, of which Julia Disco was named beneficiary.

On July 26, 1974, less than six months after the wedding, Domenic Disco died. Letters testamentary were granted to his son, Domenic Disco, Jr., the accountant, on August 23, 1974. The assets reflected in the inventory and account substantially parallel the assets listed in Schedule "A" of the antenuptial agreement.

Mrs. Disco continued to reside at the marital domicile at 2912 South Broad Street and, in August of 1975, one year after her late husband's death, she sold her own home on Hicks Street. As stated, she filed a claim for the family exemption and an election to take against her husband's will. The executor challenged her right to each, relying on the express provisions of the antenuptial agreement. He further commenced an action in equity against Julia Disco to compel her to vacate premises 2912 South Broad Street and to turn over decedent's household and personal effects. The equity action was transferred to Judge Silverstein, the auditing judge, and all questions were consolidated for trial.

At the hearing, Mrs. Disco (who was initially called by the accountant on cross-examination) related that Mr. Disco had brought a copy of the agreement to her home, that she had read the agreement, though "only out of curiosity," and that

the parties later met at the office of Ralph M. Evans, Esq., to sign it. She stated that she did not understand the agreement and "that it was done in haste," although the chronology shows that it was executed more than a month before her marriage. She related that the agreement was "a test of love" so far as she was concerned, that she "didn't think anything either way" about the size of either his or her estate. She also said that she did not ask Mr. Disco or Mr. Evans about the value of Mr. Disco's assets because she was just "interested in marrying the man."

In the light of her education, experience, age, and sophistication, the fabric that Mrs. Disco weaves is so thin it is transparent. The auditing judge did not give credence to her testimony. Nonetheless, we shall consider her contention that since no provision for payment to her appears in the body of the agreement, and since the schedules do not set forth the dollar value of the assets, the agreement is not binding on her.

Our courts have determined that a confidential relationship exists between parties intending marriage which requires from each the highest degree of good faith. Thus, a declaration in an antenuptial agreement that the value of the husband's assets has been disclosed to the intended wife is only prima facie evidence, rebuttable by extrinsic evidence: Gelb Estate, 425 Pa. 117, 120, 228 A. 2d 367 (1967).

The burden is upon the party seeking to nullify the agreement to prove that there was no reasonable provision for him or her, or that there was no fair disclosure of the other's worth: Hillegass Estate, supra; Kauffmann Estate, 404 Pa. 131, 171 A. 2d 48 (1961).

Julia Disco has failed to meet that burden. As a matter of equity and common sense, both of the disjunctive requisites for the validity of antenuptial agreements, namely reasonable provision or fair disclosure, have been met.

Basically, what courts try to ascertain in these situations (where mature individuals with children by prior marriages seek marital companionship) is whether the surviving spouse has been provided for in a reasonable and fair manner, and whether he or she will have approximately the same financial security enjoyed prior to the marriage. Factors extrinsic to the agreement are material and relevant. We cannot ignore the fact that Mr. Disco provided Julia Disco with $60,000, comprising the proceeds of life insurance. Mrs. Disco chose to leave the proceeds with The Prudential "as an investment." Apparently she selected an option which would provide her with a monthly income.

Mr. Disco's net distributable estate was $175,000. Mrs. Disco's elective share under the intestate law, should her petition be granted, would be $58,333, which, added to the $60,000 in insurance, would amount to a total of $118,333, a sum in excess of what his sons would receive.

It is noteworthy that the drafters of the Uniform Probate Code, in providing for an elective share of a surviving spouse, have evolved the concept of the "augmented estate" which includes, in addition to probate assets, nontestamentary property payable to the surviving spouse. The comment to §2-202, 8 U.L.A. 334, states that the purpose of augmenting the probate estate in computing the elective share is "(2) to prevent the surviving spouse from electing a share of the probate estate when the spouse has received a *fair share* of the total wealth of decedent

either during the lifetime of decedent or at death by *life insurance*, joint tenancy assets and other non-probate arrangements." (Emphasis supplied.) The comment explains that for policy reasons, life insurance proceeds payable to the surviving spouse are included in the augmented estate "because it seems unfair to allow a surviving spouse to disturb the decedent's estate plan if the spouse has received ample provision from life insurance."

To prevent overreaching by a surviving spouse, the Pennsylvania legislature is now considering statutory revisions. The Advisory Committee to the Joint State Government Commission has drafted proposed legislation amending Chapter 21 of the Probate, Estates and Fiduciary Code of June 30, 1972, P.L. 508, and adding a new Chapter 22 adopting the concept of the augmented estate, "so that the electing spouse is treated fairly, but not unduly generously when he or she has received assets such as life insurance not subject to election at the death of the decedent." (See Report of M. Paul Smith, Chairman, August 5, 1975.)

This court is conscious of the public policy enunciated in the Uniform Probate Code, and the proposed remedial legislation in Pennsylvania.[1] Even without these considerations, shall we permit the wife of six months who, by contract, relinquished her rights in the estate of the husband who meticulously cared for and provided for her by way of insurance, to disrupt his intended scheme of distribution, the primary purpose of which was to favor his

---

1. Remedial legislation was enacted effective June 17, 1978. Had the present legislation been in effect at the time this case was decided, there would be no question as to the instant disposition. See 20 Pa.C.S.A. §2204.

children and to perpetuate the family business he had fostered through his most productive years?

The antenuptial agreement may not be considered in a vacuum. To disregard the generosity of decedent in providing for his second wife by insurance an amount equal to one-third of his net estate would be unrealistic. Certainly this provision is not disproportionate to his total assets.[2] Accordingly, we conclude that reasonable provision has been made for Julia Disco.

Exceptant imputes a sinister significance to the absence of a dollar figure for the assets listed in the schedules of property owned by the parties to the agreement. Let us, however, consider the realities. When Mr. Disco died, experts, appraisers, and accountants were consulted to evaluate the estate for inheritance tax purposes. Even these figures might be imprecise, because assets may be sold for more or less than the amounts stated in an inventory. The value of urban real estate fluctuates; even more so does the value of a going business. Mrs. Julia Sisto was requested by her intended husband to list her assets. He, too, prepared a schedule and was meticulous as to identifying each of his possessions. It was obvious that his financial worth far exceeded hers. However, both wanted to preserve what each had accumulated for his or her own issue.

---

2. Cf. Clark's Estate, 303 Pa. 538, 154 Atl. 919 (1931), where the agreement provided one-eighth of a $450,000 estate for the wife, and Emery Estate, 362 Pa. 142, 66 A. 2d 262 (1949), where the husband was worth $1,430,000 and the agreement gave the wife $50,000 in securities. Both provisions were deemed adequate.

It is conceded that Mrs. Disco had visited Mr. Disco's relatively opulent home many times and knew that it was far more valuable than hers. Additionally, as a teller in the bank where he kept most of his business and personal savings and checking accounts, she had, or could within a few minutes have had, a reasonably accurate idea of what the total deposits were in these accounts. In the face of inflation, various economic pressures, and mounting expenses, it is virtually impossible for anyone in his prime, with an on-going business, to state his net worth with exactitude at any given moment. When Julia Sisto signed the agreement, she knew (or should have known) that Mr. Disco was an affluent man whose financial worth was many times hers and that she would substantially benefit during coverture. It would have been neither realistic nor practical for each party to have hired real estate appraisers or an accountant to prepare a balance sheet for the business (as of November 29, 1973). Julia Sisto was no bucolic, naive innocent. She had been through a "complicated" divorce. She faced the responsibilities of many working mothers in the 1970's. She was fortunate enough to find a devoted and generous man who offered his home to her and her children. She had worked as a bank teller and was sufficiently knowledgeable and skilled in financial matters to do the bookkeeping for decedent's prosperous business. Julia Sisto must have known when she herself prepared a list of her assets, at the instruction of her husband to be, and when Mr. Disco presented her with a list of his assets, both of which were submitted to her as exhibits in a legal document (the antenuptial agreement), that this was not a ploy in the mating

game, or, as she so ingenuously says, a "test of love." She knew by reading a simple, basically non-legalese document exactly what rights she was giving up.

Having associated with Mr. Disco for seven years, she cannot disclaim knowledge of his devotion to his sons, their connection with his business, and his concern for the continuation of the business. Still, she had the prospect of a very advantageous union. True, she was Mr. Disco's junior by 18 years; but age 59 was far from senility. All things being equal, she could reasonably have anticipated many comfortable years with her husband, rather than his premature death.

Neither by hindsight nor foresight is there a scintilla of evidence of concealment or misrepresentation. The assets listed by Mr. Disco in schedule "A" of the agreement are virtually identical to the assets listed in the inventory of the estate. Ralph M. Evans, Esq., the scrivener of the agreement, who was called as a witness by Mrs. Disco, testified that although he personally did not know the exact value of the assets of either party and did not disclose such knowledge to either, "there was never any misrepresentation. . . . because I would not have drawn up the agreement if that was the case." Since Julia Sisto had the agreement in her possession for a day or days, she could have consulted with counsel, including her own cousin, or any individual whose judgment she trusted in financial matters. She either did so, or trusted her own seasoned judgment.

Separation or property settlement agreements, except as they may prejudice children of a marriage, are almost universally held binding upon husbands and wives who are sui juris. There is a

more compelling reason to construe antenuptial contracts strictly, since death has sealed the lips of one of the parties. Still, antenuptial agreements are determined on an ad hoc basis considering the age, intelligence and experience of the parties. When Julia Sisto relinquished her spousal rights, she did so with maturity, her full faculties, and her eyes wide open. She had had extensive experience in a financial institution; she was related to an able lawyer whom Mr. Disco had recently consulted on an estate plan; and she was certainly able to read straightforward English. Having known and trusted Mr. Disco for seven years, Julia Sisto signed an agreement which provided, "Wife represents that full disclosure has been made to her and she has been requested and invited to make any further additional examination that she may desire. . . . and that she is fully satisfied with this agreement." (Par. 9)

There is no requirement that there be an exact disclosure or that the precise value of the property be given to the other contracting party in order to validate an antenuptial agreement. See Kauff-mann Estate, 404 Pa. 131, 136 n.8 (1961). Disclo-sure of the exact value of the husband's assets is unnecessary: Groff's Estate, 341 Pa. 105, 19 A. 2d 107 (1941); 18 P.L.E. 59, 61 §26; Emery Estate, supra.

In Baldwin Estate, 22 Fiduc. Rep. 56 (1971), aff'd per curiam 447 Pa. 599, 290 A. 2d 421 (1972), a surviving husband challenged the validity of an antenuptial contract alleging decedent did not know her net worth or that she owned a motel which was valued at about 90-94 percent of her assets. The court upheld the agreement, finding that "[b]eing a close personal friend of decedent

[prior to the marriage] he had to be aware, at least, of the approximate value of this motel. Yet—and he had the burden of proving that a full and fair disclosure of her worth was not made to him—no testimony was presented that he had no such knowledge." Baldwin, at 74.

Mrs. Disco errs in equating this case with McClellan Estate, 365 Pa. 401, 75 A. 2d 595 (1950). There, the husband disclosed assets of $132,000, when he was actually worth $519,000. Under those circumstances, the court found that there was a material misrepresentation tantamount to constructive fraud and that a provision in the agreement for the wife of $5,000 and a legacy of $15,000 was unreasonable and unjust.

The law applicable in this case and to antenuptial agreements generally has been set forth admirably in the auditing judge's opinion. We are further bolstered by the article Antenuptial Agreements in Pennsylvania, 55 Dickinson Law Rev. 382 (1951), and the comprehensive comment on the decision in Hillegass Estate, supra: Pennsylvania Marital Agreements, 12 Duquesne Law Rev. 286 (1973). The instant case closely parallels McCready's Estate, 316 Pa. 246, 175 Atl. 554 (1934), which can be regarded as controlling precedent. With this foundation, we shall avoid a plethora of citations and confine ourselves to the conclusions which follow inexorably from our study of the case law, the commentaries, and the above recited facts.

We affirm the findings of the auditing judge that there was no intentional or unintentional concealment or misrepresentation by Mr. Disco. On the contrary, in view of their long relationship and the worldliness of Mrs. Disco, we agree that despite the omission of a dollar valuation of the assets, that

there was full and fair disclosure to Mrs. Disco and that she had knowledge of the approximate, if not the exact, value of her late husband's worth. We are not persuaded that a woman who compiled a list of her assets for submission to counsel as an exhibit to an antenuptial agreement and had that relatively simple agreement in her possession for at least a day, executed it without close scrutiny because she considered it a "test of love."

By virtue of providing $60,000 in insurance for her, Mr. Disco gave her a sum which exceeds what might have been the widow's intestate share of the probate estate, a sum which appears to be adequate for a marriage of six months between a 59-year-old man and a 41-year-old woman. The arrangements made were obviously fair and reasonable, especially since Julia Disco is not the mother of decedent's children, and did not aid him in accumulating his wealth.

There can be no doubt that Mr. Disco has provided his widow with a sufficient sum to enable her to live in a style as good as, if not better than her standard of living before their marriage.

Bruno, J. concurs in the result only.


ORDER


And now, July 11, 1977, the exceptions to the decision of the auditing judge, striking the widow's election to take against the will and any inter vivos transfers, dismissing her claim for the family exemption and granting the prayer of the bill in equity to remove her from the premises 2912 South Broad Street and to recover decedent's personal and household effects therein, are hereby dismissed.