## In Re: Estate of Wade L. Sweet

*Plimpton L. Graul, Jr.*, for petitioner.
*Miles K. Karson*, for respondent.

STRANAHAN, *P.J.*, October 21, 1982—

### FINDINGS OF FACT

And now, October 1, 1982, this court having conducted an evidentiary hearing in this matter makes the following findings of fact:

1. Wade L. Sweet resided at 5 Rosedale Avenue, Greenville, Pa., and died on May 9, 1982. At that

time he was married to Nellie Sweet. The marriage occurred on March 21, 1981.

2. At the time of the marriage, Nellie Sweet was 75 years old and Wade L. Sweet was 87 years old. The parties had known each other for a couple of years and had agreed to marry in January of 1981.

3. Plimpton Graul, Jr. is an attorney who maintains an office in Greenville, Pa., and is licensed to practice in the Commonwealth.

4. Mr. Graul met with decedent and his wife in his office on February 17, 1981. At that time, the parties were not married, but were contemplating matrimony, and a discussion was held with Mr. Graul concerning the desire of the parties that the children of each party should inherit from the parent, and that the property should not go to the spouse. Mr. Graul suggested that there be an antenuptial agreement prepared together with the wills, which would be executed by the parties.

5. On February 19, 1981 a second meeting was held in Mr. Graul's office. At that time, he had prepared the antenuptial agreement which was executed by both Mr. and Mrs. Sweet, and also had prepared separate wills for each of the parties which were also executed at that time.

6. The antenuptial agreement was made from a form which appears in the Pennsylvania Transactions Guide at pages 241-32 and 241-33. Copies of these pages have been offered and received into evidence.

7. During the two meetings referred to above, there was no specific discussion held in regard to the assets owned by each of the parties. Mr. Graul did get the impression that each was aware of what the other owned, but he recalls no discussion as to the specific type of assets owned by each other.

8. While the meeting was instigated by dece-

dent, Mr. Graul was serving as counsel for both parties at the time of the meeting. Mrs. Nellie Sweet was not represented by separate counsel, but did participate in the discussion with her husband and Mr. Graul.

9. On February 19, 1981, Mr. Graul had prepared the papers and the parties read both the antenuptial agreement and the wills, asked no questions and executed the documents.

10. Mrs. Sweet had talked with her husband prior to their marriage about entering into an arrangement whereby the children of each of the parties would inherit the entire estate. She does not recall a specific discussion of assets by the parties prior to the execution of the antenuptial agreement and the wills, but she does recall that decedent owned a home, and that he said he had some bank stock, a hospitalization policy that covered him, and a small amount of life insurance. The knowledge concerning the bank stock, hospitalization and insurance policy was acquired by the wife after the execution of the antenuptial agreement.

11. Mr. Sweet had no knowledge of the assets of Mrs. Sweet prior to the execution of the antenuptial agreement, other than that information that may have been gained from their association.

12. If decedent had told Nellie Sweet that he was worth $40,000 at the time the antenuptial agreement was signed, she still would have signed the agreement.

## DISCUSSION

The law in Pennsylvania concerning antenuptial agreements is relatively clear. The agreement is presumed to be valid: Friedman Estate, 483 Pa. 614, 398 A. 2d 615 (1979); Hillgrass Estate, 431 Pa.

144, 244 A. 2d 672 (1968). Also, the spouse seeking to avoid or nullify the agreement must prove by clear and convincing evidence that the deceased spouse, at the time the agreement was executed, made *neither* a reasonable provision for the surviving spouse *nor* a full and fair disclosure of the value of his assets: Id. at 150, 244 A. 2d at 675, Gelb Estate, 425 Pa. 117, 123, 228 A. 2d 367, 370 (1967); Kaufman Estate, 404 Pa. 131, 136, 171 A. 2d 48, 50 (1961).

It is conceded that the agreement here did not contain any provision in favor of Mrs. Sweet. Mr. Sweet also did not provide for Mrs. Sweet in his will which was consistent with their understanding that the property of each would be left to the children from their prior marriages. Because there was no provision in Mrs. Sweet's favor, she need not prove the first element of the above test. Nevertheless, in order to avoid the effect of her agreement, she must prove by clear and convincing evidence that Mr. Sweet failed to fully and fairly disclose the value of his assets.*

Full and fair disclosure does not mean that the parties must reveal the *exact* value of their property: Hillgrass Estate, 431 Pa. 144, 244 A. 2d 672 (1968); Holwig Estate, 348 Pa. 71, 33 A. 2d 915 (1943); McCready Estate, 316 Pa. 246, 175 A. 554 (1934); Emery Estate, 362 Pa. 142, 66 A. 2d 262 (1949); Rupnicki Estate, 59 Delaware L J. 411

---

*It should be noted that Mrs. Sweet, an interested party, testified as to events which occurred before her husband's death. Her interest was adverse to that of the estate of Mr. Sweet and, therefore, her testimony should have been rendered inadmissible under the Dead Man's Act, 42 Pa.C.S.A. §5930. However, counsel for the estate failed to object and therefore waived the restrictions of the act: Hughes v. Bailey, 202 Pa. Super. 263, 195 A. 2d 281 (1963).

(1972). It has been held sufficient where the individual knows that the other spouse is a "person of means." McCready Estate, 316 Pa. 246, 175 A. 554 (1934).

Certainly there was adequate disclosure in the present case. Mrs. Sweet was aware at the time she married Mr. Sweet that he owned the house in which he lived. This house comprised half the value of his estate. The entire estate was valued at approximately $40,000 and the house was worth $24,000. She also knew Mr. Sweet for approximately two years before their marriage. Surely, she must have learned something about his standard of living from that long association.

Mrs. Sweet also testified that she would have signed the agreement even if she had been told expressly that Mr. Sweet's estate was valued at around $40,000. She was neither shocked nor surprised by the value of his estate. She must, therefore, have had an idea that his property was worth approximaely that amount. Therefore, even though there were no detailed discussions concerning the extent and value of Mr. Sweet's property, it is fair to say that Mrs. Sweet had a good idea where Mr. Sweet stood in life.

Furthermore, the antenuptial agreement stated expressly that full disclosure had been made. The exact language of the agreement is as follows:

WHEREAS, both parties to this Agreement have made to each other a full and complete disclosure of the nature, extent and probable value of all their property, estate and expectancy.

Such a provision is prima facie evidence that a full disclosure took place: Vallish Estate, 431 Pa. 88, 244 A. 2d 745 (1968). In order to overcome this presumption, the party seeking to avoid the agree-

ment must show by clear and convincing evidence that an inadequate disclosure took place. We are not prepared to hold that this burden has been met especially in light of the fact that there is no requirement to disclose the *exact* value of a party's property and also that the circumstances lead compellingly to the conclusion that Mrs. Sweet had a very good idea what Mr. Sweet's property was worth.

There are also several other persuasive reasons why this agreement should be upheld. First, there can be no contention that Mr. Sweet attempted to defraud Mrs. Sweet or misrepresent the value of his estate. There is not even a hint of this in the facts. They had several discussions between them concerning the reasons why Mr. Sweet wanted the agreement. They both agreed that it would be better if their separate property went to their respective children instead of to each other. In light of these facts, how can it be contended that Mr. Sweet somehow intended to defraud his future wife?

Secondly, Mrs. Sweet's present position is quite inconsistent with the agreement into which she entered voluntarily. Based on their prior informal discussions, Mrs. Sweet was well aware what the purpose of the agreement was. It is fair to say that their marriage was based partly on the validity of this agreement. It would defeat Mr. Sweet's justifiable expectations to allow her now to avoid the express terms of her agreement.

Finally, allowing Mrs. Sweet to elect against the will would work an injustice against Mr. Sweet's children, the beneficiaries under his will. Mr. Sweet was 87 years old at the time of the marriage. Mrs. Sweet was 75 years old. It cannot be contended that Mrs. Sweet somehow helped Mr. Sweet accumulate the property comprising his estate. To

allow her now to claim part of this estate would allow her to "reap where she has not sown." McCready Estate, 316 Pa. 246, 254, 175 A. 554 (1934) (quoting Neely's Appeal, 124 Pa. 406, 426-7 (1889). She expended no energy in the acquistion of this property and it would be wrong to Mr. Sweet's children to allow her now to claim part of it.

These reasons are sufficient in our minds to provide a firm basis for the denial of Mrs. Sweet's petition to elect against her deceased husband's will.

## ORDER

And now, October 21, 1982, this court having conducted a hearing in this matter finds that the antenuptial agreement entered into by Nellie Sweet and Wade L. Sweet is a valid and binding agreement on the parties and the election of Nellie Sweet to take against the Will of Wade L. Sweet, deceased, is denied.

Exceptions are granted to Nellie Sweet from the findings of fact, conclusion of law and order of this court.