## McConahy v. McConahy

C.P. of Lawrence County, No. 10679 of 2012, C.A.

*Phillip L. Clark*, for plaintiff.
*Bradley G. Olson, Jr.*, for defendant.

PICCIONE, *J.*, September 16, 2013—Before the court for disposition is the defendant's, Ashley L. McConahy (hereinafter, the "defendant"), motion to set aside marital settlement agreement (hereinafter, the "motion"). The defendant and the plaintiff, Sean T. McConahy (hereinafter, the "plaintiff") were married on July 9, 2001, in Florida. During the course of their marriage, the parties had three minor children and resided in Lawrence County, Pennsylvania. Around the end of April 2012, the defendant decided that she desired to terminate her marriage to the plaintiff. (N.T. 4-1-13 pg. 7). On June 4, 2012, the plaintiff filed a complaint in divorce, wherein the plaintiff avers that his marriage to the defendant is irretrievably broken. On June 5, 2012, the parties filed a marital settlement agreement that the defendant now contests.

On October 17, 2012, the defendant filed the instant motion to set aside marital settlement agreement

(hereinafter, the "motion"), in which the defendant argues that the martial settlement agreement (hereinafter, the "agreement") should be set aside for the following reasons: (1) the plaintiff did not fully and/or fairly disclose his financial assets; (2) the terms of the agreement are wholly unfair to defendant's legal interest in the martial property; (3) the defendant signed the agreement as a result of the plaintiff's continued mental abuse; (4) the agreement is unreasonable; and (5) attorney Michael C. Bonner (hereinafter, "attorney Bonner") was not acting in a neutral capacity in the drafting and execution of the agreement. Evidentiary hearings on the instant motion were held in this court on January 31, 2013, April 1, 2013 and April 30, 2013. Additionally, each party submitted memoranda of law in support of each party's respective positions. The court now sets forth a recitation of the testimonies of the witnesses during the evidentiary hearings.

The parties became socially acquainted with attorney Bonner when their children participated in youth activities together. In approximate late April or early May 2012, the parties contacted attorney Bonner and informed him of their intent to seek a divorce. When attorney Bonner met with both the plaintiff and defendant he informed then that he was not representing either party in an adversarial divorce action; rather, he would merely assist them in working through the divorce process. (N.T. 1-29-13 pg. 9). Attorney Bonner met with one or both of the parties on three scheduled meetings, on May 3, 2012, May 9, 2012, and May 24, 2012. Additionally, the parties individually met with attorney Bonner spontaneously, without a scheduled appointment. Attorney Bonner then drafted a

proposed marital settlement agreement based upon his meetings with the parties and a spreadsheet prepared by the plaintiff that consisted of compilation of assets. The spreadsheet had columns for the name of the asset, the plaintiff's proposed distribution of the asset to the defendant, the defendant's proposed retention of the asset. (N.T. 1-29-13 pgs. 14-16). Attorney Bonner later reviewed the spreadsheet item by item in his office simultaneously with both of the parties. (N.T. 1-29-13 pg. 16).

Attorney Bonner testified that he discussed with the parties a temporary support payment to the defendant until the defendant was able to obtain a job, child support, spousal support, splitting savings accounts, income tax returns, as well as an IRA account. (N.T. 1-29-13 pgs. 22-23). Attorney Bonner testified that he found the defendant to have a "more than adequate" grasp of the marital assets, and she corrected the plaintiff in several instances. (N.T. 1-29-13 pg. 48). The plaintiff and his father owned a farm in the form of a partnership. Mr. Bonner informed the plaintiff and defendant during their discussions that the defendant, specifically, was entitled to have the assets of the farm valued; however, attorney Bonner testified that the parties did not discuss the defendant's receiving any portion of the farm. Attorney Bonner testified that when one party would begin to ask him questions regarding the terms of the proposed marital settlement agreement, attorney Bonner instructed the parties to obtain counsel.

Attorney Bonner testified that he advised the parties that a martial settlement agreement would be a full and comprehensive agreement and neither party would

be entitled to anything outside what is included in that agreement. (N.T. 1-29-13 pg. 43). Moreover, attorney Bonner gave both parties an opportunity to review the agreement prior to meeting with him to execute a final agreement. (N.T. 1-29-13 pg. 46). He sent the agreement via email to the plaintiff alone because the plaintiff allegedly communicated to attorney Bonner that he and the defendant would be discussing it together and the plaintiff would ensure that the defendant received the draft agreement. (N.T. 1-29-13 pg. 51). Additionally, attorney Bonner testified that he received feedback from both parties regarding the terms of the draft agreement. (N.T. 1-29-13 pg. 49).

Attorney Bonner testified that over the course of his meetings with the parties, together and on an individual basis, the defendant never appeared to be distraught; rather, the defendant appeared to be "flippant" or "jovial." (N.T. 1-29-13 pg. 37). Attorney Bonner testified that the defendant neither confided in him that she was afraid of the plaintiff nor did the defendant appear to him to be afraid of the plaintiff. Moreover, attorney Bonner did not find the plaintiff to be in control of the terms of the agreement during the discussions.

The defendant's testimony contradicts much of attorney Bonner's testimony. First, the defendant does not recall meeting with attorney Bonner in May 2012, nor does the defendant recall attorney Bonner's reviewing the terms of the proposed marital settlement agreement with the parties prior to her signing a final draft. (N.T. 4-1-13 pgs. 9, 20). However, the defendant does recall receiving the proposed

martial settlement agreement and noticing changes that were incorporated into the final draft. (N.T. 4-1-13 pg. 34). The defendant also testified that she never spoke to attorney Bonner on the telephone regarding her divorce and that all discussions with attorney Bonner occurred while in the plaintiff's presence. (N.T. 4-1-13 pgs. 12, 17).

The defendant testified that she knew the values of the parties' bank accounts; however, she did not know the value of the plaintiff's retirement account at the Ellwood City Credit Union. (N.T. 4-1-13 pgs. 23-25). The defendant was also aware of the value of the parties' IRA accounts. (N.T. 4-1-13 pg. 32). The defendant discussed the division of the vehicles with the plaintiff while at attorney Bonner's office. (N.T. 4-1-13 pgs. 26-27). The defendant maintains that she and the plaintiff have not discussed any distribution of personal property. (N.T. 4-1-13 pg. 33). The defendant testified that she asked for personal property and never received those items. (N.T. 4-1-13 pg. 33).

The defendant also testified regarding her employment through McConahy farm (hereinafter, the "farm"). The defendant retained the position of bookkeeper for the farm. (N.T. 4-1-13 pg. 35). Through her employment with the farm, the defendant was primarily responsible for paying bills through one of the two accounts in the farm's name, preparing quarterly reports for tax purposes, and issuing paychecks to the employees. (N.T. 4-1-13 pg. 34-35). The defendant also delivered documents to the accountant upon request. (N.T. 4-1-13 pg. 37). The defendant testified that she would attempt to answer questions the accountant had.

(N.T. 4-1-13 pg. 37). However, the defendant testified that she was unaware of the farm's inventory or equipment, accounts receivables, accounts payable, but she did receive and view bank statements for both farm accounts. (N.T. 4-1-13 pgs. 38-39). Additionally, the defendant was aware that the farm had completed its payments on a number of the farming equipment. (N.T. 4-1-13 pg. 40). She was aware that the farm utilized a mower and a skid loader upon which the farm was making payments, but the farm was not making payments on other pieces of equipment. Regarding the assets of the farm, the defendant was aware that it encompasses an extensive amount of real estate, approximately 1,000 acres. (N.T. 4-1-13 pg. 42). The defendant also knew that the farm is titled as a partnership, with the plaintiff and his father, Tom McConahy, as the two partners. (N.T. 4-1-13 pg. 42).

The defendant testified that she was present for the negotiations between the plaintiff and his father of the partnership interest that was gifted to the plaintiff. (N.T. 4-1-13 pg. 59). Although the defendant asserts she did not take part in the negotiations of the terms, she would communicate any changes in those terms to the attorney, Robert Clark, Esquire (hereinafter, "attorney Clark"), who handled the agreement. (N.T. 4-1-13 pg. 59). She also transferred paperwork between attorney Clark and the plaintiff when necessary. (N.T. 4-1-13 pg. 60). Additionally, pursuant to creating a partnership interest for the plaintiff, Mr. Tom McConahy and the plaintiff obtained an appraisal of the equipment of the farm. (N.T. 4-1-13 pg. 63). The appraiser, Mr. Whiting, visited the farm and appraised the equipment in 2009. (N.T. 4-1-13 pgs. 63, 80). The

defendant testified that she was present for the appraisal. (N.T. 4-1-13 pg. 63). The defendant acknowledged that at the time she and the plaintiff approached Mr. Bonner to create a marital settlement agreement, she was aware that the plaintiff held a partnership interest in the farm, and she knew of the asset values provided to Mr. Whiting. (N.T. 4-1-13 pg. 66).

During the course of her employment as the farm's bookkeeper, the defendant enrolled in a course through The Pennsylvania State University designed for farm bookkeeping. (N.T. 4-1-13 pg. 52). The instructor to the course downloaded spreadsheets and charts of accounts for a dairy business onto her computer. (N.T. 4-1-13 pg. 53). Although the defendant was employed as a bookkeeper for the farm for approximately three years, she never utilized those programs. (N.T. 4-1-13 pg. 53). Additionally, the farm's bank statements were delivered to the parties' marital residence. (N.T. 4-1-13 pg. 53). Upon receiving those statements, the defendant opened them, stapled them together, and made annotations on them to ensure checks cleared. (N.T. 4-1-13 pg. 53). The defendant concedes that she had a general knowledge of the farming operation. (N.T. 4-1-13 pg. 55). The defendant also created year-end accounting reports. (N.T. 4-1-13 pg. 56). These reports included, *inter alia*, the employees, the amount of money spent on supplies, repairs, feed, breeding, and the amount paid in taxes. (N.T. 4-1-13 pg. 56). The defendant also noted deposits and other credits on bank statements. (N.T. 4-1-13 pg. 57).

During the defendant's employment with the farm, the

Farm entered into an oil and gas lease with Shell. (N.T. 4-1-13 pg. 44). The farm received approximately $900,000.00 as an up-front royalty. (N.T. 4-1-13 pgs. 44-45). This royalty was payable to the individual partners and included on each partner's personal income tax returns. (N.T. 4-1-13 pg. 45). With this payment, the partners set up funds with a stockbroker. (N.T. 4-1-13 pg. 45). The defendant asserts that she had no involvement with creating those funds, nor did she know what the values of those funds were. (N.T. 4-1-13 pg. 45). She further asserts that she had no involvement with negotiating the terms of the oil and gas lease; however, she did negotiate whether a well would be placed on the property. (N.T. 4-1-13 pg. 46).

The defendant asserts that she feared the plaintiff. (N.T. 4-1-13 pg. 47). She testified that he was an "intense person," and she sought treatment for that fear during marriage counseling sessions she and the plaintiff attended. (N.T. 4-1-13 pg. 47). Also, the defendant asserts that the plaintiff requested the defendant sign a marital settlement agreement quickly. (N.T. 4-1-13 pg. 49). She testified that she perceived a sense of urgency in the plaintiff's tone regarding signing an agreement. (N.T. 4-1-13 pg. 49). However, the defendant testified that she attended the meetings with attorney Bonner by driving her own vehicle alone and knew she was free to leave at any time she wanted. (N.T. 4-1-13 pg. 65). Furthermore, she testified that she knew she was free to take the proposed marital settlement agreement to an independent attorney to review, and nothing stopped her from doing so. (N.T. 4-1-13 pg. 76).

While negotiating a martial settlement agreement, the defendant specifically recalls agreeing to receive a portion of the plaintiff's pension. (N.T. 4-1-13 pg. 72). Additionally, the defendant testified that she negotiated staying on the plaintiff's health insurance through his employer. (N.T. 4-1-13 pg. 72). The defendant also testified that she and the plaintiff negotiated when each would claim their children as dependents. (N.T. 4-1-13 pg. 75). The defendant could not recall whether she requested any changes to be made to the proposed marital settlement agreement she received from Mr. Bonner. (N.T. 4-1-13 pg. 74).

The plaintiff's father, Mr. Thomas McConahy, also testified during the hearing on April 1, 2013. Mr. Thomas McConahy testified that before gifting the plaintiff with a partnership interest in the farm, he arranged for the farm to be appraised. (N.T. 4-1-13 pg. 90). Mr. Thomas McConahy testified that defendant was present during the appraisal and during the discussions regarding the assets of the farm. (N.T.4-1-12 pgs. 90-91). Additionally, Mr. Thomas McConahy testified that attorney Clark drafted a number of proposed partnership agreements. (N.T. 4-1-13 pg. 91). Mr. Thomas McConahy testified that the defendant was actively involved in those negotiations in that she would speak to attorney Clark, make appointments with him and retrieve and drop off documents to attorney Clark's office. (N.T. 4-1-13 pg. 91). Mr. Thomas McConahy testified that the defendant was privy to all information contained in the partnership agreement but did not dictate the terms of that agreement. (N.T. 4-1-13 pgs. 92, 97).

Mr. Thomas McConahy also testified regarding the defendant's employment as the farm's bookkeeper. He testified that she was responsible for the "books" and prepared documents for the accountant, and paid bills. (N.T. 4-1-13, pgs. 92-94). Mr. Thomas McConahy testified that he would write approximately eighty percent of the checks and the defendant would record them. (N.T. 4-1-13 pg. 98). Additionally, Mr. Thomas McConahy testified that if he questioned the value of any of the farm's two bank accounts, he would instruct the defendant to call the bank. (N.T. 4-1-13 pg. 94). He testified that she had access to both the farm's bank accounts and any password that may be necessary to obtain that information. (N.T. 4-1-13 pg. 94).

Mr. Thomas McConahy also testified regarding the oil and gas lease. He testified that he, the plaintiff, the defendant, the Shell representative and his girlfriend were all present for the negotiations. (N.T. 4-1-13 pg. 95). He further testified that the defendant had access to all oil and gas information since it was kept at the marital residence. (N.T. 4-1-13 pg. 95). After receiving the royalty payment pursuant to the oil and gas lease, Mr. Thomas McConahy, the plaintiff, and the defendant met with a stockbroker and their accountant, Ms. Karen McFarland, to discuss potential investments. (N.T. 4-1-13 pgs. 96-97). Mr. Thomas McConahy testified that the defendant was an active participant in these conversations as well. (N.T. 4-1-13 pg. 97).

Attorney Clark testified during the April 30, 2013 hearing. Attorney Clark performed legal work for the

plaintiff and his father over a number of years. (N.T.4-30-13 pg. 5). He prepared a partnership agreement for the plaintiff and his father in 2009. (N.T. 4-30-13 pg. 5). Attorney Clark testified that most of his communication was through the defendant as the defendant would contact him, drop off or pick up papers regarding the partnership agreement. (N.T. 4-30-13 pg. 6, 9). Additionally, attorney Clark testified that the defendant would bring certain items to his attention that the partners wanted to be included in the agreement and he had discussions with her to confirm what deeds were being transferred into the partnership. (N.T. 4-30-13 pg.7). Attorney Clark clarified that the defendant did not have any ownership interest in the partnership nor did she negotiate the terms of the partnership with him. (N.T. 4-30-13 pg. 9).

Ms. Karen McFarland (hereinafter, "McFarland") also testified during the April 30, 2013 hearing. McFarland is a tax preparer who prepared taxes for the plaintiff and the farm. (N.T. 4-30-13 pg. 13). McFarland testified that the defendant would bring a summary of the farm's expenses so she could prepare a tax return. (N.T. 4-30-13 pg. 14). McFarland testified that she recalled instances when she needed clarification of the expenses and the defendant answered those questions for her or she would obtain the answer from a partner and relay it back to McFarland. (N.T. 4-30-13 pg. 15). McFarland testified that she and the defendant met two to three times per year to prepare the farm's taxes. (N.T. 4-30-13 pg. 18). During each meeting McFarland and the defendant would discuss the farm's bank statements and the summary of expenses, which were prepared by the defendant. (N.T.

4-30-13 pgs. 18-20). McFarland testified that based upon her interactions with the defendant, it appeared that the defendant was familiar with the farm's finances although she did not discuss values of assets with the defendant. (N.T. 4-30-13 pg. 25). Additionally, McFarland prepared the parties' personal income tax returns. (N.T. 4-30-13 pg. 22). McFarland would primarily deal with the defendant in preparing these returns as well. (N.T. 4-30-13 pg. 22).

Lastly, the plaintiff testified during the April 30, 2013 hearing. The plaintiff testified that the defendant suggested that they use attorney Bonner to draft a marital settlement agreement because they knew him through the children's affiliation with youth sports. (N.T. 4-30-13 pg. 35). The plaintiff testified that he called attorney Bonner to schedule a meeting with him, and he met with attorney Bonner initially alone in April 2012, then together with the defendant two or three additional times. (N.T. 4-30-13 pg. 36). The plaintiff testified that although attorney Bonner did not participate in establishing the terms of the marital settlement agreement, he did inform the parties, *inter alia*, that they needed to establish child and spousal support, if any, and to create a comprehensive list of the marital assets. (N.T. 4-30-13 pgs. 36-37). The plaintiff also testified that attorney Bonner informed the parties that they were entitled to obtain independent counsel if they wished. (N.T. 4-30-13 pg. 39). The plaintiff could not recall if the defendant met with attorney Bonner alone, but he testified that the defendant informed him that she had spoken to attorney Bonner on the telephone. (N.T. 4-30-13 pg. 38).

The plaintiff testified that he and the defendant actually negotiated the terms of a marital settlement agreement. (N.T. 4-30-13 pg. 39). The plaintiff recalled that the defendant requested receiving a lesser portion of his pension than she would be entitled to receive by law if she could remain on the plaintiff's health insurance provided to him through his employment with Lincoln High School in Ellwood City. (N.T. 4-30-13 pg. 39). The plaintiff testified that he agreed to those terms after discussing with his employer whether the defendant could continue to receive health insurance benefits under his heath insurance policy after separation. (N.T. 4-30-13 pg. 86). Additionally, the plaintiff testified that he and the defendant discussed when each would claim their children as dependents. (N.T. 4-30-13 pg. 40). The plaintiff also recalled that the defendant told him that she did not want anything that was tied to the Farm. (N.T. 4-30-13 pg. 100). Moreover, upon separation, the plaintiff testified that he and the defendant agreed to close their joint accounts and split the monies. (N.T. 4-30-13 pg. 42).

The plaintiff testified that he presented values of various items and accounts to the defendant. (N.T. 4-30-13 pg. 50). He testified that he created a spreadsheet that included estimates of the parties' marital assets and discussed them with the defendant. (N.T. 4-30-13 pg. 50-51). The plaintiff recalled at least three edited spreadsheets that were changed based upon his conversation with the defendant. (N.T. 4-30-13 pg. 67). These spreadsheets did not include any asset of the farm. (N.T. 4-30-13 pg. 69). The plaintiff could not recall if he told the defendant that she would not be entitled to any asset of the farm's.

(N.T. 4-30-13 pg. 69). Further, the plaintiff insisted that he provided the defendant with all information she requested of those assets. (N.T. 4-30-13 pg. 51). The plaintiff testified that the defendant never requested copies of the parties' bank statements, credit card statement, pension account statement, or IRA holdings. (N.T. 4-30-13 pg. 52). The plaintiff testified that the defendant was the spouse who kept and filed those statements in the marital residence. (N.T. 4-30-13 pg. 55).

The plaintiff also testified regarding personal items located within the marital residence. The plaintiff testified that he was aware of two instances in April 2012 during which the defendant and the plaintiff's cousin entered the residence while the plaintiff was at work to retrieve any personal items she wanted. (N.T. 4-30-13 pg. 52). The plaintiff testified that she retrieved a number of her personal belongings, a couch, and a television, at that time. (N.T. 4-30-13 pg. 52). The plaintiff also testified that the defendant returned to the residence after the parties' signed the marital settlement agreement to retrieve additional items. (N.T. 4-30-13 pg. 52).

The plaintiff also testified regarding his and the defendant's personal finances. The plaintiff testified that the defendant took the responsibility to pay the bills for the family. The plaintiff also testified that account statements for his credit union account were delivered to his mailbox at his employer, except during the summer months when they would be delivered to the marital residence. (N.T. 4-30-13 pg. 43). The plaintiff testified that the defendant never accessed this account on her own, but she was

present when the plaintiff withdrew $7,000.00 from that account to purchase a camp site in Andover, Ohio in 2011. (N.T. 4-30-13 pg. 43).

The plaintiff also testified regarding the defendant's employment with the farm. The plaintiff testified that the defendant was employed as a bookkeeper for the farm. (N.T. 4-30-13 pg. 44). When the defendant began working as the bookkeeper, the farm purchased a computer for her and the defendant enrolled in the a course designed for farming accounting. (N.T. 4-30-13 pg. 45). The defendant was employed as a bookkeeper for the farm for approximately three years and generally performed all duties on her own. (N.T. 4-30-13 pg. 45-46). The plaintiff testified that the defendant generally performed her work on time, but occasionally fell behind and needed the plaintiff's assistance. (N.T. 4-30-13 pg. 93).

Additionally, the plaintiff testified that the defendant was not present for the initial meeting with attorney Clark to discuss the partnership interest but became involved afterwards. (N.T. 4-30-13 pg. 47). The plaintiff testified that he and his father would review a draft partnership agreement and the defendant was always present and would look over the agreement as well. (N.T. 4-30-13 pg. 47). The plaintiff recalled discussing with the defendant their concerns regarding their children's future interest in the farm. (N.T. 4-30-13 pg. 48). The plaintiff testified that he and the defendant discussed assigning their children as the only beneficiaries of the farm. (N.T. 4-30-13 pg. 48).

The plaintiff also recalled when he and his father arranged for an appraisal of the farm in connection with

creating the partnership interest. (N.T. 4-30-13 pg. 54). The plaintiff testified that he, his father, and the defendant walked around the farm with the appraiser. (N.T. 4-30-13 pg. 54). Immediately thereafter, these parties proceeded into the marital residence to discuss the values of the farm assets. (N.T. 4-30-13 pg. 54). The approximate fair market values of the assets were then recorded. (N.T. 4-30-13 pg. 54). The plaintiff believes that the defendant was the person who recorded those asset values. (N.T. 4-30-13 pg. 54).

Lastly, the plaintiff testified that the defendant was actively involved in negotiating the oil and gas lease. (N.T. 4-30-13 pg. 48). He recalled that the defendant negotiated the distance from the house Shell could place a well upon the property. (N.T. 4-30-13 pg. 49). This oil and gas lease was also not included on any of the spreadsheets the plaintiff created while negotiating a settlement with the defendant. (N.T. 4-30-13 pg. 69). The plaintiff testified that he believed the oil and gas lease and the proceeds therefrom were considered to be farm assets. (N.T. 4-30-13 pgs. 69-70). The plaintiff explained that the monies he and his father received as partners in the farm pursuant to the oil and gas lease were to be included in their personal income taxes because the farm is not an entity according to the law, and any income received therefrom must be claimed by the partners on their personal income tax returns. (N.T. 4-30-13 pg. 75). Some of the proceeds of the oil and gas lease were invested back into the farm; specifically, the partners prepaid items used for feed one year in advance and purchased equipment. (N.T. 4-30-13 pgs. 97-98). The plaintiff testified that the defendant

contacted the company to set up the prepayment. (N.T. 4-30-13 pg. 101). After paying off debt, prepaying items, and purchasing equipment, the defendant testified that approximately $200,000.00 remained from the proceeds of the oil and gas lease. (N.T. 4-30-13 pg. 102). It was this amount that the parties used to form the IRA funds. (N.T. 4-30-13 pg. 102).

Pursuant to the Supreme Court of Pennsylvania's analysis in *Simeone v. Simeone*, post-nuptial agreements are to be evaluated as any other contract. 581 A.2d 168 (Pa. 1990). "Traditional principles of contract law provide perfectly adequate remedies where contracts are procured through fraud, misrepresentation, or duress." *Id.* at 166. Absent a showing of the same, the parties are bound by their agreements. *Id.* In determining the validity of a postnuptial agreement, it is irrelevant if the terms of the contract are reasonable or the bargain was advantageous to either party. *Id.* The reasonableness of the terms of the contract is not appropriate for judicial review. One is assumed to understand the terms of the contract into which he is entering and those terms "must be regarded as binding without regard to whether the terms were fully understood by the [party]. *Ignorantia non excusat.*" *Id.*

Additionally, the Supreme Court refused to mandate that a contract is void unless each party consults with an independent legal counsel. The court stated that this "would constitute a paternalistic and unwarranted interference with the parties' freedom to enter into contracts." *Id.* However, the court acknowledged and reaffirmed the long standing principle "that a full and

fair disclosure of the financial positions of the parties is required." *Id.* at 167. Such disclosure need not be exact, as long as it is "full and fair." *Kaufmann Estate*, 171 A.2d 48, 51 n.8 (Pa. 1961). The court stated, "Absent this disclosure, a marital misrepresentation in the inducement for entering a[n agreement] may be asserted." *Simeone*, 581 A.2d at 167. "If an agreement provides that full disclosure has been made, a presumption of full disclosure arises. A spouse may attempt to rebut this presumption through an assertion of fraud or misrepresentation; however, such presumption can be rebutted if it is proven by clear and convincing evidence." *Paroly v. Paroly*, 876 A.2d 1061, 1066 (Pa. Super. 2005). "[A]n agreement is valid even if it does not contain financial disclosure itself and can be upheld if it merely recites that such disclosure has been made." *Id.* Finally, "[w]hether adequate disclosure has been made will depend on the facts and circumstances of individual cases." *Mormello v. Mormello*, 682 A.2d 824 (Pa. Super. 1996) (overruled on other grounds).

Furthermore, the Superior Court in *Lugg v. Lugg*, 64 A.3d 1109 (Pa. Super. 2013) found that "a party [may] waive economic disclosure in terms of a prenuptial agreement, as long as the waiver is voluntary and in writing." The court continued, that since prenuptial and post-nuptial agreements are to be similarly construed, "full economic disclosure, it is waiveable in a post-nuptial agreement." *Id.* at 1112-13. Therefore, if a post-nuptial agreement contains a waiver of economic disclosure, it is valid and enforceable absent a showing of fraud, misrepresentation or duress. *Id.* at 1113.

First, defendant argues that this court should set aside the agreement because the plaintiff did not fully and/or fairly disclose his financial assets. As stated above, absent a full and fair disclosure of the parties' financial worth, "a material misrepresentation in the inducement for entering a[n] agreement may be asserted." *Mormello*, 682 A.2d at 828. A full and fair disclosure requires that a "reasonable estimate of the worth of the assets must be attempted so that the general financial resources of the parties are not obscured." *Hess*, 580 A.2d 357. "If an agreement provides that full disclosure has been made, a presumption of full disclosure arises." *Simeone*, 581 A.2d at 167. A party can rebut this presumption by proving fraud, duress, or misrepresentation in the inducement for entering the agreement by clear and convincing evidence. *Id.*

On the first page, the instant agreement states, "WHEREAS, the parties have been fully advised of their legal rights and obligations and have been fully informed of their respective property holding, income, liabilities and expectancies[.]" Additionally, section eighteen of the agreement is entitled the "Warranty of Disclosure." This section states the following:

Husband and Wife represent that they have disclosed to each other in full, their respective assets and liabilities, as of the date of separation, that they have been given ample opportunity to identify analyze and value the assets titled in the name of or held for the benefit of the other party and that this Agreement was negotiated and entered into on the basis of those disclosures and their substantial accuracy.

Agreement. §18. Further, section thirteen of the agreement is entitled "Business Interest." This section provides the following:

> Husband is a partner in McConahy Farm (hereinafter 'The Farm'). Wife hereby waives, assigns, designates, and transfers any and all rights, title, claim and interests to Husband which she may have, had or shall at anytime have to his business interest in The Farm. Effective with the execution of this Agreement, Husband will be the sole and exclusive owner of his business interest in The Farm and may take action with respect to his business interest as he, in his sole discretion deems appropriate. Husband warrants that Wife has no responsibility with respect to his business interest.

Agreement. Pg. 7. §13. Based upon the language of these above three sections, the agreement clearly provides that full disclosure has been made. Therefore, the court finds that there is a presumption of full disclosure. In order to rebut this presumption, the defendant must make a showing of fraud, duress, or a material misrepresentation by clear and convincing evidence.

In an attempt to rebut the above presumption, the defendant argues that the plaintiff did not disclose to her the value of the farm, equipment, structures, and animals, and crops located therein. The court finds this contention to be contrary to the evidence and testimony presented during the three evidentiary hearings described above. The credible evidence establishes that the defendant was employed as a bookkeeper for the farm from the time the plaintiff acquired the partnership interest in 2009 until the

parties' separation in April 2012.

Through her employment, the defendant had obtained a general knowledge of the daily farming operations. She took a class offered through an extension of The Pennsylvania State University that taught procedures for farming bookkeeping.[1] The defendant also paid bills through one of the two bank accounts the farm utilized and issued pay checks to employees. She opened the farm's bank statements and annotated them. The defendant prepared year-end statements that accounted for the farm's expenditures and income. Moreover, the defendant prepared quarterly reports for tax purposes, delivered them to the farm's accountant two to three times a year and reviewed those statements with the accountant. Further, The defendant possessed the account numbers and passwords for both bank accounts owed by the farm. Upon request, the defendant would obtain balances for both accounts. The defendant had access to the farm's financial information and accessed that information upon request. Therefore, it is evident by the access afforded to the defendant to this information that she was fully engaged in the financial affairs of the farm such that she appreciated its operations and value.

"Indeed, where a spouse is fully engaged in the financial affairs and is familiar with a business owned by the other spouse, [the court] will uphold an agreement even when it contains neither disclosure nor an affirmation that disclosure was made." *Paroly*, 876 A.2d at 1066. In light

---

1. Although the defendant obtained spreadsheet forms and programs from this class, she never employed them in her bookkeeping of the farm.

of the foregoing, the court finds that the Agreement indeed contains an affirmation of disclosure, and the defendant was fully engaged in the financial affairs of the farm. The court finds that the defendant signed the agreement with the full knowledge of the value of the farm, and she waived any interest therein by signing the agreement. Therefore, the defendant is bound by the waiver in section thirteen, "Business Interest," contained in the agreement.

The defendant also claims that the agreement should be set aside because there was no full and fair disclosure of the parties' marital assets. Under the facts of this case, the defendant has failed to prove that she was deprived of full and fair disclosure of the marital estate at the time the agreement was executed. The defendant testified that she was aware of the values of the parties' personal bank accounts. Additionally, attorney Clark and McFarland testified that the defendant was privy to all investment information when the financial advisor established the parties' IRA accounts. The defendant argues that the availability of financial information is not equivalent to full and fair disclosure thereof. *See Ebersole*, 713 A.2d at 104-105. Although an accurate statement of the law, the court finds that the defendant not only had access to the parties' financial information, but she also was fully aware of the values of such assets as she was the party who took the responsibility to pay any bills and receive the financial statements. It is evident that the defendant actually possessed the information of the parties' assets as attorney Bonner could recall instances in which the defendant corrected the plaintiff regarding the value of certain marital assets. Additionally, both the plaintiff

and attorney Clark testified that the plaintiff's mentality was that of a "simple farmer" and the defendant was the spouse who was responsible for the parties' finances. This court finds this testimony to be more credible than the defendant's assertion of ignorance.

The only asset of which the defendant did not fully know the value was the plaintiff's retirement benefits account with the Ellwood City Federal Credit Union; however, she testified that she knew the existence of the account, and she received statements from that account during the summer months. Moreover, the defendant was responsible for paying the parties' bills during the course of their marriage. "Although...a full and fair disclosure does not require disclosure of the exact amount of property, *Kaufmann's Estate*, 171 A.2d 48. 404 Pa. 131 (1961), there must be a sufficient disclosure of assets to allow the other party to make an intelligent decision concerning the rights which will be given up under the terms of the agreement." *Nitkiewicz v. Nitkiewicz*, 535 A.2d 664, 667 (Pa. Super. 1988). The defendant knew about this account and received its statements during the summer months from this account. The court cannot find that the exact worth of the retirement account had a substantial bearing on the parties' property distribution. As a result, the circumstances of the instant case establish that the defendant had a sufficient understanding of the parties' assets at the time the agreement was executed.

Based upon the above, the defendant has failed to rebut the presumption of full and fair disclosure by clear and convincing evidence of fraud or a misrepresentation.

Although the agreement did not contain the values of the assets, this does not invalidate the agreement. The facts and circumstances of this case demonstrate that the defendant was fully and fairly aware of the marital estate. As such, the parties are bound by the disclosure language contained in the agreement.

The defendant also argues that the agreement should be set aside because it is wholly unfair to her legal interest. It is not for the court to invalidate an agreement based upon the unfairness of its terms. The alleged inequity of the bargain may not be evaluated by the court. *See Sabad v. Fessenden*, 825 A.2d 682, 688 (Pa. Super. 2003). Moreover, the agreement explicitly states the following:

> WHEREAS, both parties represent by the execution of this Agreement, that they fully understand all of the terms, conditions and provisions of this Agreement and believe it to be fair, just, adequate and reasonable as to each of them and consonant with the best interests and welfare of their child, and accordingly both Husband and Wife freely and voluntarily accept such terms, conditions and provisions.

Agreement pg. 2. The above terms are clear and unambiguous. "[T]he paramount goal of contract interpretation is to ascertain and give effect to the parties' intent." *Bianchi v. Bianchi*, 859 A.2d 511, 515 (Pa. Super. 2004). "[W]here, as here, the words of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the express language of the agreement itself." *Id.* As a result the clear intent of the parties in the

instant case has been memorialized in the agreement. The defendant is, therefore, not entitled to relief on this basis.

Similar to the above argument, the defendant also argues that the agreement should be set aside because it is unreasonable. This contention is without merit. The court in *Simeone* provided that the reasonableness of an agreement is not a proper subject for judicial review. 581 A.2d at 166. *See also Lugg v. Lugg*, 64 A.3d 1109, 1112 (Pa. Super. 2013). As a result, this court will not consider the reasonableness of the agreement; and the agreement cannot be set aside on this basis.

Next, the defendant argues that the agreement should be set aside because she was under the duress of her husband. The court in *Hamilton v. Hamilton*, 591 A.2d 720, 721 (Pa. Super. 1991) defined duress as follows:

> That degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness… Moreover, in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel.

(citing *Carrier v. William Penn Broadcasting Co.*, 233 A.2d 519 (Pa. 1967)).

In the instant matter, there is little evidence or testimony that the defendant signed the agreement under duress. The defendant testified that the plaintiff is "an intense person" and she addressed this issue with the parties' marriage counselor. The defendant did not testify that

she was actually afraid of the plaintiff or that the plaintiff threatened to or inflicted any degree of restraint upon the defendant. Moreover, the agreement plainly states that "neither party has retained counsel on their own behalf, although understanding and being aware of their right to do so, and freely, voluntarily and under their own accord without duress and any promises other than set forth herein, understand their rights and responsibilities, agree and consent to execute this agreement without the aid nor assistance of counsel, understanding the legal significant of this Agreement." In addition to the language of the agreement, attorney Bonner testified that he advised each party that both could obtain counsel. The defendant also conceded that she knew she could have obtained counsel prior to signing the agreement. She also admitted to signing the agreement voluntarily and attending the meetings with attorney Bonner under her own free will. Therefore, there is no merit to the defendant's claim that she signed the agreement under duress. Accordingly, the defendant is not entitled to relief from the agreement on this basis.

The defendant next argues that the agreement should be set aside because attorney Bonner was not acting in a neutral capacity when drafting and executing the agreement. A review of the testimony reveals that attorney Bonner was indeed acting in a neutral capacity when drafting the agreement. The testimony clearly establishes that attorney Bonner refused to give the parties legal advice and acted solely as the scrivener. Attorney Bonner's thirteen-year friendship with the plaintiff does not suggest that attorney Bonner was

acting as the plaintiff's attorney and unfairly towards the defendant.

The record reveals that attorney Bonner filed the complaint in divorce on behalf of the plaintiff; however, on the cover sheet, the complaint in divorce states that his representation is for filing purposes only. The court finds this to be of no consequence. The record also reveals that the defendant actively participated in negotiating the provisions of the agreement. The agreement also states the following:

> WHEREAS, neither party has retained counsel on their own behalf, although understanding and being aware of their right to do so, and freely, voluntarily and under their own accord without duress or any promises other than set forth herein, understanding their rights and responsibilities, agree and consent to execute this Agreement without the aid nor assistance of counsel, understanding the legal significance of this Agreement.

Agreement pg. 1. The court finds this language to be presumptively persuasive. Neither party has presented any evidence to suggest that attorney Bonner coerced the defendant to sign the agreement or that attorney Bonner treated either party unfairly or in any way but a neutral capacity. As such, the court finds that attorney Bonner was acting in a neutral capacity when drafting the agreement.

Based upon the foregoing, the court finds the instant agreement to be a valid contract including a bargained for exchange. The defendant through her testimony conceded that she negotiated the terms of the contract with the

plaintiff. She also admitted that she voluntarily signed the agreement. As a result, the agreement and its terms are valid and will not be set aside.

Lastly, the defendant argues that the oil and gas lease is outside the scope of the agreement and should be subject to independent equitable distribution proceedings. As stated above, the farm obtained an oil and gas lease with the Shell Corporation. The defendant argues that the oil and gas lease is not a business interest that would come within in the language of section thirteen of the agreement. As also provided *supra*, section thirteen states the following:

> Husband is a partner in McConahy Farm (hereinafter 'The Farm'). Wife hereby waives, assigns, designates, and transfers any and all rights, title, claim and interests to Husband which she may have, had or shall at anytime have to his business interest in The Farm. Effective with the execution of this Agreement, Husband will be the sole and exclusive owner of his business interest in The Farm and may take action with respect to his business interest as he, in his sole discretion deems appropriate. Husband warrants that Wife has no responsibility with respect to his business interest.

Agreement, pg. 7. §13.

The defendant argues that since the royalty payment from the oil and gas lease was included on the partners' personal incomes taxes and there was no provision that required the partners to reinvest the monies into the farm, the proceeds from the lease are not a business asset

of the farm's. This court does not find this argument to be persuasive. The Shell Corporation contracted only with the partners of the farm for the oil and gas lease. Only the partners as partners to the farm had an interest in the land that was subject to the oil and gas lease. The proceeds were lawfully included on each partner's personal income taxes by way of the Internal Revenue Code. The proceeds of the lease were first used to satisfy necessities of the farm. The oil and gas lease appears to be more persuasively a business interest of the farm than of the marital estate. However, the court does not need to classify the proceeds from the oil and gas lease because it is of no consequence.

As found above, the defendant knowingly and voluntarily waived her right to obtain any additional interest in the farm or income of the plaintiff's. Section three, entitled "Mutual Release" provides in relevant part, "Wife hereby releases all rights, interest, claims, demands and privileges in or to any or all the real or personal property now owned by the [Plaintiff] as his own personal estate[.]" Agreement, §3. Furthermore, section nineteen of the agreement is entitled "Waiver of Rights and Obligation" and provides, in relevant part, the following:

> [A]ny further debt or liability or property obtained by the respective party hereto shall belong to that party only, and the other party hereto shall not be responsible for any debt or obligation of that party, nor shall either party have any claim to any additional property attained hereafter by one of the parties hereto.

Agreement, §19. Based upon the language of these provisions, and the considerations discussed above, specifically the defendant's access to and intimate knowledge of the finances of both the marital estate and of the Farm, the court finds that the defendant has knowingly and effectively waived her right to any interest beyond those contained in the agreement, including any proceeds from the oil and gas lease executed on behalf of the farm.

Based upon the foregoing, the defendant's petition to set aside marital settlement agreement is hereby denied.

## ORDER OF COURT

And now, this 16th day of September, 2013, the case being before the court on January 29, 2013, April 1, 2013, and April 30, 2013 regarding defendant's motion to set aside marital settlement agreement, with Phillip L. Clark, Jr., Esquire, appearing and representing the plaintiff, and with Bradley G. Olson, Jr., Esquire, appearing and representing the defendant, it is hereby ordered and decreed as follows:

1. Defendant's motion to set aside marital settlement agreement is hereby denied pursuant to the attached opinion.

2. The prothonotary shall properly serve notice of this order and attached opinion upon counsel of record; and if a party has no counsel, then upon said party at their last known address as contained in the court's file.